JOHN SHARKEY AND REGINA SHARKEY, APPELLANTS,
v. BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, APPELLEE.
615 N.W. 2d 889

Filed August 11, 2000.    No. S-98-1061.

Thomas D. Waldman and Marlon A. Polk, of Polk, Waldman & Wickman, L.L.C., for appellants.

John C. Wiltse for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

The instant appeal arises out of a stabbing incident on the campus of the University of Nebraska at Omaha (UNO). Danny

Clark, a UNO student, stabbed John Sharkey (Sharkey) during an altercation over Clark's harassment of Sharkey's wife, Regina Sharkey (Regina). Sharkey sustained serious injuries to his hands and arms. He sought recovery in a suit filed against the Board of Regents of the University of Nebraska (University) under the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Cum. Supp. 1992). Regina joined her claim for loss of consortium with Sharkey's claim against the University.

Generally, the Sharkeys alleged that the University was negligent in failing to protect them from this physical attack, in failing to take reasonable security measures, and in failing to timely and adequately respond to, or intercede in, the physical attack on Sharkey. After a bench trial, the district court concluded that the relevant statute of limitations, § 81-8,227, barred the Sharkeys' claim and further stated in its order that the attack on Sharkey was not reasonably foreseeable. The Sharkeys' motion for a new trial was overruled, and this appeal followed.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Sharkey and Regina were enrolled as UNO students in October 1993. Clark was also a student at UNO at that time, and both Clark and Regina were enrolled in an exercise class taught by Lora Tharp. On October 4, before the class began, Clark was bothering Regina, grabbing her arms and generally harassing her. At that time, Regina did not tell Tharp about the incident, but she told Sharkey about the encounter. That evening, Sharkey left a message on Tharp's answering machine expressing a desire to talk about the incident. Sharkey left his telephone number and told Tharp to call him back, day or night, to discuss the problem.

Tharp did not return Sharkey's call that night; instead, she decided to contact UNO authorities about what to do regarding the harassment. The next day, Tharp contacted her supervisor and was told to arrange a meeting with the Sharkeys; Tharp and her supervisor did not discuss contacting campus security. Tharp returned Sharkey's call on October 5, 1993, and left a message informing Regina that she would like to meet with her before or after class the next day. Regina asked Sharkey to accompany her to the meeting.

On October 6, 1993, the Sharkeys went to the health, physical education, and recreation (HPER) building to meet with Tharp. While waiting in the hall, the Sharkeys encountered Clark. Clark came from behind and grabbed Regina. Regina told Sharkey that Clark was the man who had been harassing her. Sharkey went over to Clark and told him to stop touching Regina and that he did not want Clark in the same vicinity as her again. Sharkey said that Clark told him to wait right there. The Sharkeys decided not to wait for Clark, and they began looking for a telephone, but were unable to locate one.

Clark returned with a knife. Sharkey told Regina to get some help and then tried to convince Clark to put the knife down. Regina ran downstairs and told those she encountered to get some help because there was a man upstairs with a knife. When she returned to the scene, Sharkey and Clark were still circling each other, with Clark jabbing at Sharkey. Regina ran back downstairs to make sure that someone had called for help; she was assured that help was on the way. When Regina once again returned upstairs, Clark had stabbed Sharkey. Both Regina and Sharkey noticed the presence of a security officer in the gathering crowd. After a few minutes, Clark ran away from Sharkey. HPER officials and onlookers administered first aid to Sharkey. Sharkey was taken to the hospital; he had sustained injuries to both of his arms, wrists, and hands, resulting in medical expenses of $39,035.08. Campus security personnel apprehended Clark while he was fleeing.

The Sharkeys filed a claim with the State Claims Board pursuant to the State Tort Claims Act on February 15, 1994 (tort claim No. 94-355). The Sharkeys alleged that the University knew or should have known that Clark would cause injury to Sharkey and/or others similarly situated. Sharkey claimed personal injuries, and Regina claimed a loss of consortium. Their claim was denied on June 13.

The Sharkeys filed another claim with the State Claims Board on January 18, 1995 (tort claim No. 95-381). In this claim, the Sharkeys alleged that UNO security officers were present during the fight, but did nothing to protect Sharkey's life. This claim was also denied on June 2. The Sharkeys filed a petition in the district court on September 20, 1995.

In their third and operative petition, the Sharkeys alleged that the University was negligent in (1) failing to protect them from persons on its campus when the University knew or should have known that the Sharkeys could be physically attacked by such persons, (2) failing to protect the Sharkeys from Clark when the University knew or should have known that the Sharkeys could be physically attacked by Clark, (3) failing to take reasonable security measures for the protection of the Sharkeys and other students, (4) failing to make telephones adequately available for the Sharkeys' use in the case of a life-threatening emergency, (5) failing to establish or implement adequate security measures for the protection of the Sharkeys and others from careless or criminal conduct on the UNO campus, and (6) failing to timely and adequately respond to or intercede in the physical attack on Sharkey.

A bench trial was held. Much of the evidence focused on UNO's knowledge of Clark, the level of campus crime in general, and the adequacy of UNO's security measures. Regarding UNO's knowledge of Clark's behavior, Alesia Morris and Keisha Turner testified that Clark had stalked them beginning in 1990 and 1991, respectively. Morris told campus security about her problems with Clark; however, because Clark had not touched or threatened her, Morris was told that nothing could be done.

Turner testified that Clark had stalked her where she worked. Additionally, Clark had attempted to caress her face once while she was at UNO. Turner reported this encounter to UNO campus security, but she did not know Clark's name at that time. Turner did, however, tell security personnel that she thought an acquaintance of hers knew Clark's name. She also told campus security about her prior encounters with Clark. Campus security did not contact either her or her acquaintance. When asked why security did not contact Turner's acquaintance to investigate Turner's claim, a campus security corporal stated, "Probably because I got busy with something else. I don't recall." Later, Turner went back to campus security with the name of her alleged perpetrator (Clark). Campus security never contacted Turner about her complaint.

Turner stated that Clark had never threatened her with a weapon. Regina similarly testified that Clark had not threatened

her with a weapon. Tharp, the aerobics instructor, testified that she had never seen Clark threaten anyone.

Several witnesses testified about the stabbing incident itself and the perceived adequacy of the UNO campus security's response. Regina testified that during the altercation, a campus security officer stood in front of the gathering crowd of students and told them to stand back. Sharkey was also aware of the security officer's presence and testified that no one came to his aid during the attack. This security officer was deposed prior to trial, and her deposition was received into evidence at trial. The security officer testified that she had training in the area of university security prior to her employment at UNO. The security officer stated that she had received no training at UNO regarding the protection of students, but had been trained elsewhere.

The security officer testified that her patrol areas fluctuated during 1993. Her duties included patrolling the HPER building, looking for disturbances, and checking the various activity courts. The security officer also stated that security personnel are not permanently stationed at the HPER building.

On the day of the stabbing, the security officer was in the office in the Eppley Administration Building when campus security received a call regarding the stabbing. She testified that approximately 2 or 3 minutes elapsed between the receipt of the emergency call and the time she arrived with three other officers at the HPER building. The officers encountered Clark coming down the stairs and apprehended him. While two of the officers removed Clark from the building, she and another officer went upstairs, where they saw Sharkey. She noticed that the HPER staff was giving Sharkey medical assistance and attempted to keep onlookers from interfering with that assistance.

One witness, a then employee at HPER, testified about his memory of the stabbing incident. The witness saw Clark running with a knife and then heard Clark and Sharkey yelling. The witness called UNO campus security when he heard the commotion. He estimated that the incident lasted "just a few minutes" and recalled seeing at least two security officers arrive at the scene.

Another UNO employee was in the HPER building at the time of the stabbing and saw some of the incident occur. This

witness stated that Clark's flight from the scene and the arrival of two UNO security officers were "almost simultaneous." The witness testified that he was not aware of anyone coming to Sharkey's aid while the attack was in progress.

A corporal of UNO campus security also testified. The corporal had responded to the call regarding the stabbing and participated in apprehending Clark. The corporal stated on cross-examination that during his 17-year tenure at UNO, he was aware of three to five major crimes, such as a rape or knifing. Additionally, during cross-examination of the corporal, the Sharkeys presented exhibit 115, which was a campus security report dated September 21, 1992. According to the Sharkeys' offer of proof, exhibit 115 contained an account of an incident between two students in which one student had threatened another with a knife while they were arguing over a parking space. Although the corporal testified that if he had received an account of one student brandishing a knife against another, he would attempt to contact the student who had allegedly displayed the weapon and report his findings in a supplemental report, no supplemental report was attached to exhibit 115. Exhibit 115 was excluded from evidence, based on objections of relevancy and of being beyond the scope of direct examination.

Finally, evidence was adduced regarding security incidents in "Zone 4," the area of the UNO campus where the attack occurred. In 1992, there were 26 complaints of criminal activity reported to campus security in that zone; in 1993, the year of the attack, there were 25. Some of these incidents involved assault and harassment. UNO's manager of campus security testified that there were 26 assaults in the 10 other zones of the UNO campus during 1990 through 1993.

Several assaults had occurred in Zone 4, specifically, at the HPER building. At the HPER building, a physical assault between two individuals during an intramural basketball game occurred on March 3, 1992. No serious injuries resulted from the incident. On September 25, another violent incident transpired during a basketball game at HPER, resulting in the victim's sustaining a broken jaw. In September 1993, an intramural football game in Zone 4 resulted in the Omaha Police

Department's arresting one individual for assault. In an earlier incident which occurred on October 3, 1991, a non-UNO student was assaulted while participating in a UNO intramural football game located in Zone 4.

On July 31, 1998, the district court issued its order, denying recovery for the Sharkeys. The court focused on two issues: the statute of limitations and foreseeability. The district court concluded that the Sharkeys' claim was barred by the statute of limitations because they did not file suit within 6 months after the mailing of notice denying their first claim, despite the fact that the Sharkeys filed suit within 2 years of the time their claim accrued. The court concluded it lacked subject matter jurisdiction over this suit because of this purported untimeliness.

Notwithstanding the fact that the district court determined it lacked subject matter jurisdiction, the court went on in its order to find as a matter of fact that the actions of Clark were not reasonably foreseeable and that the knowledge that Clark had harassed or assaulted Regina previously did not give rise to the foreseeability of the severe knife attack on Sharkey.

The Sharkeys moved for a new trial, which was denied. This appeal followed. We moved this case to our docket pursuant to our authority to regulate the caseloads of the appellate courts of this state. Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

### III. ASSIGNMENTS OF ERROR

The Sharkeys assert, restated, that the district court erred in (1) ruling that their lawsuit was barred by the statute of limitations and that the district court did not have subject matter jurisdiction over the lawsuit; (2) ruling that the actions of Clark were not reasonably foreseeable to the University; (3) excluding evidence regarding foreseeability and thereby limiting the scope of cross-examination (specifically, the district court excluded exhibit 115, which contained an allegation of an individual brandishing a knife in a threatening manner on campus toward another student); (4) failing to issue adequate conclusions of fact found separately from conclusions of law in its order, despite the Sharkeys' request to do so during trial; and (5) overruling the Sharkeys' motion for a new trial.

## IV. STANDARD OF REVIEW

■ On an appeal from a judgment rendered in an action brought under the State Tort Claims Act, the findings of the trial court will not be disturbed unless clearly wrong. *Talle v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 823, 572 N.W.2d 790 (1998); *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998).

■ When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below. *State v. Gray*, 259 Neb. 897, 612 N.W.2d 507 (2000).

■ A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *In re Application of SID No. 384*, 259 Neb. 351, 609 N.W.2d 679 (2000); *Blue Valley Co-op v. National Farmers Org.*, 257 Neb. 751, 600 N.W.2d 786 (1999). An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Gestring v. Mary Lanning Memorial Hosp.*, 259 Neb. 905, 613 N.W.2d 440 (2000).

## V. ANALYSIS

### 1. STATUTE OF LIMITATIONS

The Sharkeys first assert that the district court erred in determining that the statute of limitations barred their claim and, thus, concluding that the court lacked subject matter jurisdiction. Section 81-8,213 states:

> No suit shall be permitted under the State Tort Claims Act unless the State Claims Board has made final disposition of the claim, except that if the board does not make final disposition of a claim within six months after the claim is made in writing to the board, the claimant may, by notice in writing, withdraw the claim from consideration of the board and begin suit under such act.

In addition, § 81-8,227(1) provides:

> Every tort claim permitted under the State Tort Claims Act shall be forever barred unless within two years after such claim accrued the claim is made in writing to the State Claims Board in the manner provided by such act. The time to begin suit under such act *shall be extended for a period of six months* from the date of mailing of notice to the claimant by the board as to the final disposition of the claim or from the date of withdrawal of the claim from the board under section 81-8,213 *if the time to begin suit would otherwise expire before the end of such period.*

(Emphasis supplied.) In the instant case, the cause of action accrued on October 6, 1993, when Clark attacked Sharkey. The Sharkeys filed their first claim (No. 94-355) with the State Claims Board on February 15, 1994, and the Sharkeys received notice of this denial on June 13. They filed their second claim (No. 95-381) on January 24, 1995, which was denied on June 2. On September 20, the Sharkeys filed a petition in district court.

The district court ruled that the statute of limitations barred the Sharkeys' claim because they did not file suit within 6 months after the mailing of notice of the final disposition of their first claim. The district court stated:

> The Nebraska State Tort Claim[s] Act requires claimants to file a claim with the State Claims Board within two years of the time the claim accrued. Plaintiffs' claims are barred notwithstanding that the plaintiffs began their suit within two years of the time that their claim accrued. The Nebraska State Claims Act requires claimants to begin suit within six months after the mailing of notice of final disposition of the claim. This Court lacks subject matter jurisdiction over plaintiffs' suit because suit . . . of Tort Claim 94-355 [was] filed more than six months after final disposition of Tort Claim 94-355.

Because of the district court's ruling, we will focus our analysis on the first claim, No. 94-355, filed with the State Claims Board even though both of the Sharkeys' claims were filed within the statutory 2-year period.

In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate

court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *King v. State, ante* p. 14, 614 N.W.2d 341 (2000); *Hobza v. Seedorff Masonry, Inc.*, 259 Neb. 671, 611 N.W.2d 828 (2000). If the language of a statute is clear, the words of such statute are the end of any judicial inquiry regarding its meaning. *Id.* Section 81-8,227 clearly provides for a 2-year statute of limitations. The Sharkeys' cause of action accrued on October 6, 1993, and they filed their suit on September 20, 1995, thus complying with the statute. The 6-month time period contained in § 81-8,227(1) is an extension of time, not a limitation, in those instances where the claimant has filed a so-called fourth-quarter claim. In other words, a claimant who files a tort claim with the State Claims Board 18 months or more after his or her claim has accrued, but within the 2-year statute of limitations, has 6 months either from the date of mailing of notice by the board as to the final disposition of the claim or from the date of withdrawal of the claim, in which to begin suit. *Coleman v. Chadron State College*, 237 Neb. 491, 466 N.W.2d 526 (1991).

In *Coleman v. Chadron State College, supra*, we addressed the 6-month extension provision of § 81-8,227. Coleman, the claimant, filed his claim with the State Claims Board in the 22d month after his claim had accrued. Because § 81-8,213 requires that a claim must repose with the State Claims Board at least 6 months before the claim can be withdrawn, Coleman was prevented from filing suit before the 2-year statute of limitations ran. Coleman withdrew his claim approximately 31 months after it accrued. The district court granted summary judgment for Chadron State College, concluding that Coleman's claim was time barred. We stated that the crux of the appeal was under what circumstances, if any, the time to begin suit under the State Tort Claims Act was extended. We concluded that Coleman's claim was not time barred because § 81-8,227 provided a 6-month extension, holding:

> [A] claimant who files a tort claim with the Risk Manager of the State Claims Board 18 months or more after his or her claim has accrued, but within the 2-year statute of limitations, has 6 months from the first day on which the claim may be withdrawn from the claims board in which to begin

suit. This interpretation ensures that effect is given to the legislative intent embodied in §§ 81-8,213 and 81-8,227 and that both are applied in a consistent and commonsense fashion. Furthermore, fourth-quarter claimants are given the same opportunity as those who file earlier to withdraw their claim and file suit within 6 months thereafter.

*Coleman v. Chadron State College,* 237 Neb. at 501, 466 N.W.2d at 533.

The plain language of § 81-8,227 and our holding in *Coleman v. Chadron State College, supra,* control our determination that the 6-month provision is an extension of time in which to file suit, not a limitation as the district court concluded. We are not presented with an extension of time based on a "fourth-quarter claim" in the instant case. Thus, because the Sharkeys filed suit within 2 years of the accrual of their claim, the 6-month extension period contained in § 81-8,227(1) is inapplicable. The Sharkeys complied with the State Tort Claims Act, and their lawsuit is not time barred. We conclude that the district court erred in determining it had no jurisdiction over the Sharkeys' claim and, therefore, reverse the judgment of the district court and remand this cause for a new trial.

## 2. NEGLIGENCE CLAIM

In spite of the district court's conclusion that it lacked subject matter jurisdiction because of its statute of limitations determination, the court for some reason proceeded to decide that the Sharkeys' recovery would be barred because Clark's knife attack upon Sharkey was not reasonably foreseeable to the University. Despite the gratuitous nature of the district court's determination on foreseeability, we conclude that it is necessary to briefly address the merits of the Sharkeys' claim so that this matter is remanded to the district court in a proper analytical framework.

After the district court concluded that it did not have subject matter jurisdiction, the court stated in its dismissal order:

In the recent case of Gan[s] vs Parkview Plaza Partnership, 253 Neb. 373, 571 NW2d 261 (1997) and cases cited therein, the Nebraska Supreme Court set out the legal issues dealing with a foreseeability of a criminal act by a third party and the duty imposed on a landlord.

In this case the Court finds [as] a matter of fact that the actions of Danny R. Clark were not reasonably foreseeable to the defendant and recovery is barred. The Court further finds as a matter of fact, that the knowledge that Clark had harassed or assaulted Mrs. Sharkey previously, did not give rise to the foreseeability of the severe knife attack on Mr. Sharkey on the day in question.

This is a sad situation of two fine people being hurt and injured, but recovery must be denied as the attack was not reasonably foreseeable.

Because the district court was less than clear in its use of the concept of "foreseeability" in the final order, we will once again set forth the critical distinction between foreseeability as it applies to duty and foreseeability as it applies to proximate cause in a negligence action.

▮ Before we do so, we initially note that in order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty. See *Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000).

### (a) Duty

▮ Thus, the threshold inquiry in any negligence action is whether the defendant owed the plaintiff a duty. This court has often held that whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Knoll v. Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999). We observe, however, that the district court's order was entered prior to our opinion in *Knoll v. Board of Regents, supra*, and the order reflects some of the ambiguity present prior to *Knoll* regarding foreseeability in the duty context and foreseeability in the context of proximate cause. Although the district court addressed the foreseeability issue as a question of fact, we made it clear in *Knoll* that foreseeability, in a duty context, is a legal question for the court. The fact that a question of law involves the consideration of factual issues does not turn the former into a " ' "question of fact" ' " or necessarily mire the court in evidentiary issues of weight and credibility. *Id.* at 6, 601

N.W.2d at 762 (citing *Clemets v. Heston,* 20 Ohio App. 3d 132, 485 N.E.2d 287 (1985)).

As we noted in both *Knoll v. Board of Regents, supra,* and *Kozicki v. Dragon,* 255 Neb. 248, 583 N.W.2d 336 (1998), the distinction between foreseeability as it applies to duty and as it applies to proximate cause is a critical distinction that is too often and too easily overlooked.

> "Foreseeability as a determinant of a business owner's duty of care to its customers is to be distinguished from foreseeability as a determinant of whether a breach of duty is a proximate cause of an ultimate injury. Foreseeability as it impacts duty determinations refers to ' "the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care." ' . . . Foreseeability that affects proximate cause, on the other hand, relates to 'the question of whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff' reasonably flowed from defendant's breach of duty. . . . Foreseeability in the proximate cause context relates to remoteness rather than the existence of a duty."

*Knoll v. Board of Regents,* 258 Neb. at 7-8, 601 N.W.2d at 763 (quoting *Clohesy v. Food Circus Supermkts.,* 149 N.J. 496, 694 A.2d 1017 (1997)). Thus, foreseeability in the duty context is a legal question for the court. It is only in the proximate cause context that foreseeability is a question of fact for the finder of fact. See *id.*

In *Knoll v. Board of Regents, supra,* we employed our familiar risk-utility test, considering (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution, to decide whether the University owed a landowner-invitee duty to students to take reasonable steps to protect against foreseeable acts of hazing. In *Knoll v. Board of Regents, supra,* the appellant was a student at the University of Nebraska at Lincoln (UNL) and was hazed by members of the

Phi Gamma Delta fraternity (FIJI). This hazing resulted in severe injuries. The appellant filed suit against the University, alleging that it acted negligently in failing to enforce prohibitions against acts of hazing, the consumption of alcohol, and physically abusive behavior when the University knew or should have known that the FIJI house was in violation of the rules prohibiting such activities.

The lower court granted summary judgment in favor of the University, finding no duty. We reversed. By evaluating the totality of the circumstances, we determined that FIJI's acts of handcuffing and abducting Knoll on UNL's property were foreseeable by the University. These circumstances included the University's knowledge of two separate hazing incidents involving other fraternities. The University was also aware of several incidents involving FIJI members. A FIJI member was cited for resisting arrest, others were found in possession of alcohol at the FIJI house, one member was convicted of sexual assault of a female high school student, and one was found intoxicated and unconscious in the FIJI restroom by UNL campus police. Additionally, the FIJI fraternity was involved in an altercation with another fraternity, and two FIJI members had attempted to break into a sorority house. We noted:

> The prior instances of alcohol abuse and other law violations occurring on the FIJI house premises are therefore particularly pertinent to our determination of whether a duty exists in this case.

> The stipulated facts show that the University was aware of prior hazing instances where students had grabbed and physically removed other students from buildings, had coerced other students into drinking alcohol, and had engaged in other harassing activities. The record reflects that the University had notice that pledge sneaks could lead to illegal hazing. Thus, the University could have foreseen various forms of student hazing on its property, even though FIJI failed to disclose the pledge sneak event, including typical fraternity abductions and the consequences that could reasonably be expected to result from such activities. As such, we conclude the University owes a landowner-invitee duty to students to take reasonable

steps to protect against foreseeable acts of hazing, including student abduction on the University's property, and the harm that naturally flows therefrom.

*Knoll v. Board of Regents*, 258 Neb. 1, 9-10, 601 N.W.2d 757, 764-65 (1999).

Similar to the University's knowledge of incidents with FIJI members and hazing in general in *Knoll*, we observe in the instant case that the University had knowledge both of Clark's specific behavior and of criminal activity in general on its UNO campus. The University was aware that Clark had been harassing women; both Morris and Turner had reported his stalking behavior to UNO campus security. The University, however, did nothing to follow up on these allegations. Through its employee, Tharp, the University had knowledge that Clark's harassing behavior had continued with Regina.

It is reasonably foreseeable that such harassment could escalate into violence when the harasser is confronted, even though Clark had not displayed prior violent tendencies. We stated in *Gans v. Parkview Plaza Partnership*, 253 Neb. 373, 384, 571 N.W.2d 261, 269 (1997), *overruled on other grounds, Knoll v. Board of Regents, supra*, "[T]he law does not require precision in foreseeing the exact hazard or consequence which happens; it is sufficient if what occurs is one of the kinds of consequences which might reasonably be foreseen." Given Clark's persistent pattern of harassment, an escalation into violence is clearly one of the consequences which may reasonably be foreseen from such behavior.

In addition, the evidence reveals that numerous incidents of student violence had occurred in Zone 4 and in the HPER building in particular. The fact that Clark was not involved in these incidents is not dispositive. In *Erichsen v. No-Frills Supermarkets*, 246 Neb. 238, 518 N.W.2d 116 (1994), we held that prior criminal activity need not involve the same suspect to make further criminal acts reasonably foreseeable for purposes of imposing a duty on the landlord to undertake reasonable precautionary measures. We also stated, "[A]llegation[s] of many occasions of 'similar' criminal activity in one fairly contiguous area in a limited timespan may make further such acts sufficiently foreseeable to create a duty to a business

invitee." *Id.* at 243, 518 N.W.2d at 120. Likewise, in a landowner-invitee setting, it is the totality of the circumstances, not solely the number or location of prior incidents, that must be considered in determining foreseeability.

The evidence adduced at trial shows that violent altercations were not unknown at that particular location on the UNO campus, and thus, acts such as Clark's violent attack on Sharkey are reasonably foreseeable. As such, and similar to our conclusion in *Knoll v. Board of Regents, supra,* we hold that the University owes a landowner-invitee duty to its students to take reasonable steps to protect against foreseeable acts of violence on its campus and the harm that naturally flows therefrom. The University, as a matter of law, owed such a duty to Sharkey in the instant case.

### (b) Breach; Proximate Cause

Of course, our determination that the University owed a landowner-invitee duty to Sharkey to take reasonable steps to protect against foreseeable acts of violence and the harm that naturally flows therefrom answers only one of the issues involved in the present case. Upon retrial, it will be for the district court to decide, as the finder of fact, whether the University failed to take reasonable steps to discharge that duty and, if so, whether any specific act or omission of the University was such that the ultimate injury to Sharkey flowed from the University's breach of duty.

In other words, the Sharkeys have alleged, among other things, that the University failed (1) to take reasonable security measures for the protection of the Sharkeys and other students, (2) to make telephones adequately available for students' use in the case of a life-threatening emergency, (3) to establish or implement adequate security measures for the protection of the Sharkeys and other students from criminal conduct on the UNO campus, and (4) to timely and adequately respond to or intercede in the physical attack on Sharkey. Although evidence was adduced in the district court trial regarding the University's alleged breach of duty, there was no determination by the district court as to whether the University took reasonable steps to discharge its duty of care under the circumstances.

Moreover, since there was no determination regarding the University's alleged breach of duty, there obviously was no determination whether the ultimate injury to Sharkey flowed from any specific act or omission on the part of the University. The determination of the University's alleged breach of duty and the proximate cause of Sharkey's damages are questions of fact for the finder of fact upon retrial.

## VI. CONCLUSION

Because the district court erred in determining that the Sharkeys' action was barred by the statute of limitations, we reverse the judgment of the district court and remand this cause to the district court for a new trial based on the foregoing analysis. We need not address the Sharkeys' other assignments of error.

REVERSED AND REMANDED FOR A NEW TRIAL.