784 N.W.2d 907 (2010)
280 Neb. 205
A.W., mother and next friend of C.B., and A.W., appellants,
v.
LANCASTER COUNTY SCHOOL DISTRICT 0001, also known as Lincoln Public Schools, appellee.
No. S-09-485.
Supreme Court of Nebraska.
July 16, 2010.
*910 Vincent M. Powers, of Vincent M. Powers & Associates, Lincoln, for appellants.
John M. Guthery and Derek A. Aldridge, of Perry, Guthery, Haase & Gessford, P.C., L.L.O., Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
*911 GERRARD, J.
C.B., a kindergarten student at Arnold Elementary School in northwest Lincoln, Nebraska, was sexually assaulted in a school restroom during the school day. C.B.'s mother, A.W., sued the Lincoln Public Schools (LPS) on C.B.'s behalf, alleging that LPS' negligence permitted the assault to occur. The district court, however, entered summary judgment for LPS, reasoning that the assault was not foreseeable.
The fundamental issue in this appeal, as framed by the parties, is whether LPS had a legal duty to C.B. to protect him from the assault. But we conclude that our case law has, in the past, placed factual questions of foreseeability in the context of a legal duty when they are more appropriately decided by the finder of fact in the context of determining whether an alleged tort-feasor's duty to take reasonable care has been breached. As a result, we find that the questions of foreseeability presented in this appeal are matters of fact, not of law, and that there is a genuine issue of material fact regarding whether LPS' conduct met its duty of reasonable care. We reverse, and remand for further proceedings.

BACKGROUND

ASSAULT OF C.B.
On September 22, 2005, Joseph Siems entered Arnold Elementary School through the main entrance. The door was not locked, but there was a sign next to the entrance informing visitors that they needed to check in with the main office, which was just inside. If they checked in, they would be signed into the building and issued a visitor's nametag. The hallway inside the entrance was visible through glass windows to the two secretaries who worked in the office, and the secretaries were to watch the hallway to make sure that no visitors went past the office without signing in.
Siems went past the office without signing in. Apparently, Siems came in during the lunch hour, when one of the office secretaries was at lunch and the other was making photocopies. One of the regular secretaries was not working that day, and the replacement secretary may not have been instructed to make sure that everyone who came into the building checked in. For whatever reason, no one saw Siems come in the door. But Siems was spotted in the entrance hallway shortly thereafter by a teacher, Kathi Olson. Siems had a cigarette behind his ear and was carrying a backpack; Olson thought he looked out of place. Olson asked Siems if she could help him find anything, but he ignored her. Olson went directly to the office to see if anyone matching Siems' description had signed in.
Two other teachers, Kelly Long and Connie Peters, were monitoring some first graders when they also saw Siems in the hallway. They decided that Long would talk to Siems while Peters stayed with the students. Long saw the contact between Siems and Olson, and when Siems came near, Long asked Siems if she could help him. Siems did not respond, but after the question was repeated, Siems said he needed to use the restroom. Long pointed out a nearby restroom and told Siems that he needed to return to the main office after using the restroom. Siems went toward the restroom, and Long went to her classroom and used the telephone to report the incident to the main office. Long knew that there were no students in that restroom at the time. But Long did not watch Siems to see where he went. Peters saw Siems go into the restroom that Long had indicated, then saw him come out and go back down the hallway. Then she lost sight of him. Although no one saw him, it is apparent that Siems went back down the hallway and into another restroom closer to the main entrance.
*912 One of the school secretaries had seen Siems briefly in the hallway as she was returning from lunch. She answered the telephone when Long called the office. Olson was still there and had just determined that Siems had not signed in. After hearing from Olson and Long, the secretary went to the cafeteria to inform Shannon Mitchell, the administrator in charge of the school at the time. In the meantime, C.B., who was 5 years old, had returned from a trip to the restroom and told his teacher, Susan Mulvaney, that "there was a bad man in the restroom." C.B. later reported that Siems had pulled down C.B.'s pants and briefly performed oral sex on him. Mulvaney stayed at the door of her classroom, next to C.B., and watched the restroom door.
After speaking to the secretary in the cafeteria, Mitchell went to the restroom and saw Siems sitting in a stall. When Mitchell arrived, there were no children in the restroom. Mitchell also saw some children in the hallway approaching the restroom; she prevented them from entering. While doing so, she encountered Mulvaney, who told her what C.B. had said. Mitchell used Mulvaney's telephone to call the office and initiate a "Code Red" lockdown of the school, then went to the office and called the 911 emergency dispatch service.
The Code Red was initiated pursuant to the LPS "Safety and Security Plan" and "Arnold School Emergency Procedures and Security" guidelines that were in effect at the time. Those procedures had been put in place in compliance with LPS "Policy 6411" and "Regulation 6411.1," which required the establishment of district-wide and site-based emergency plans. Generally speaking, the LPS plan required school personnel responding to a trespasser to nonconfrontationally contact the trespasser and, based on what followed, consider calling a Code Red. The Arnold Elementary School procedures explained, generally, the individual responsibilities associated with a Code Red and described the lockdown procedures.
After initiating the Code Red and calling 911, Mitchell went to some benches in the hallway near the restroom and watched the restroom door, along with an assistant principal who was in the building and a school custodian. After being contacted by the assistant principal, Siems left the restroom and then the building, followed by the assistant principal and custodian. The custodian detained Siems as police arrived, and Siems was taken into police custody.

PROCEDURAL HISTORY
C.B.'s mother, A.W., filed this claim against LPS on C.B.'s behalf under the Political Subdivisions Tort Claims Act.[1] As relevant, A.W. alleged that LPS was negligent in failing to have an effective security system and in allowing a stranger to enter C.B.'s school. A.W. alleged that LPS failed to use reasonable care to protect C.B.
LPS filed a motion for summary judgment, supported by evidence of the events described above, Mulvaney's opinion that her actions were reasonable, and the opinion of LPS' director of security that the LPS and Arnold Elementary School emergency procedures were adequate. In response, A.W. adduced evidence of incidents near Arnold Elementary School that had been reported to the Lincoln Police Department between 2001 and 2005, although most of those incidents involved nonviolent crimes and took place outside of school hours.
The district court entered summary judgment for LPS. The court found that Siems' assault of C.B. was not foreseeable *913 and that the police incident reports provided by A.W. were insufficiently similar to Siems' actions to place LPS on notice of the possibility of a sexual assault by an intruder. The court found that LPS had made a prima facie showing that its security plan was adequate and that A.W. had not rebutted that evidence. And the court found that even if the safety and security plan in effect was inadequate, it was exempt from the Political Subdivisions Tort Claims Act as a discretionary function.[2] A.W. appeals.

ASSIGNMENTS OF ERROR
A.W. assigns, consolidated and restated, that the district court erred in finding that (1) LPS did not owe a duty to protect C.B. from the danger of sexual assault by Siems, (2) the sexual assault of C.B. was not reasonably foreseeable, (3) LPS took reasonable steps to protect against foreseeable acts of violence on its premises, (4) Arnold Elementary School had a safety and security plan in effect at the time of the assault which complied with pertinent state law, and (5) the school's safety plan was discretionary.

STANDARD OF REVIEW
Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[3] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, giving that party the benefit of all reasonable inferences deducible from the evidence.[4]

ANALYSIS

FORESEEABILITY AND DUTY UNDER RESTATEMENT (THIRD) OF TORTS
In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages.[5] The duty in a negligence case is to conform to the legal standard of reasonable conduct in the light of the apparent risk.[6] The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.[7] But it is for the fact finder to determine, on the facts of each individual case, whether or not the evidence establishes a breach of that duty.[8]
A.W. first argues that LPS had a duty to protect C.B. from the danger of sexual assault, that the sexual assault of C.B. was reasonably foreseeable, and that LPS' response was inadequate to that foreseeable danger. In support of this argument, A.W. relies on the risk-utility test that we have used to determine the existence of a tort duty.[9] Under that test, we have considered (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the *914 foreseeability of the harm, and (6) the policy interest in the proposed solution.[10]
But LPS does not dispute that it would owe C.B. a duty to protect him against any reasonably foreseeable acts of violence on its premises.[11] So A.W.'s first three arguments are really three different ways of framing the same question: Was Siems' assault of C.B. reasonably foreseeable? A.W.'s arguments with respect to foreseeability boil down to two primary contentions: first, that the LPS employees who saw Siems on the day of the assault should have foreseen the danger that he represented and, second, that the neighborhood in which Arnold Elementary School is located was sufficiently dangerous to place LPS on notice of a danger that a student could be sexually assaulted.
In previous cases, because the existence of a legal duty is a question of law, we have also treated the foreseeability of a particular injury as a question of law.[12] This places us in the peculiar position, however, of deciding questions, as a matter of law, that are uniquely rooted in the facts and circumstances of a particular case and in the reasonability of the defendant's response to those facts and circumstances.
For that reason, the use of foreseeability as a determinant of duty has been criticized, most pertinently in the recently adopted Restatement (Third) of Torts.[13] The Restatement (Third) explains that because the extent of foreseeable risk depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter.[14] Indeed, foreseeability determinations are particularly fact dependent and case specific, representing "a [factual] judgment about a course of events ... that one often makes outside any legal context."[15] So, by incorporating foreseeability into the analysis of duty, a court transforms a factual question into a legal issue and expands the authority of judges at the expense of juries or triers of fact.[16]
That is especially peculiar because decisions of foreseeability are not particularly "legal," in the sense that they do not require special training, expertise, or instruction, nor do they require considering far-reaching policy concerns.[17] Rather, deciding what is reasonably foreseeable involves common sense, common experience, and application of the standards and behavioral norms of the communitymatters that have long been understood to be uniquely the province of the finder of fact.[18]
In addition, we have defined a "duty" as an obligation, to which the law gives recognition and effect, to conform to a particular standard of conduct toward another.[19] Duty rules are meant to serve *915 as broadly applicable guidelines for public behavior, i.e., rules of law applicable to a category of cases.[20] But foreseeability determinations are fact specific, so they are not categorically applicable, and are incapable of serving as useful behavioral guides.[21] And, as the Arizona Supreme Court explained, "[r]eliance by courts on notions of `foreseeability' also may obscure the factors that actually guide courts in recognizing duties for purposes of negligence liability."[22]
Instead, as the Restatement (Third) explains, an actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.[23] But, in exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that a defendant has no duty or that the ordinary duty of reasonable care requires modification.[24] A no-duty determination, then, is grounded in public policy and based upon legislative facts, not adjudicative facts arising out of the particular circumstances of the case.[25] And such ruling should be explained and justified based on articulated policies or principles that justify exempting these actors from liability or modifying the ordinary duty of reasonable care.[26]
For example, the Iowa Supreme Court adopted the Restatement (Third) in Thompson v. Kaczinski[27] and, in Van Fossen v. MidAmerican Energy Co.,[28] applied it to limit the duty owed by an employer of an independent contractor to a member of the household of an employee of the independent contractor. The court explained that foreseeability of the harm was not part of the analysis, but that an exception to the general duty of reasonable care was warranted, as a matter of policy, based upon an independent contractor's control of the premises where the work was to be performed and the difficulty inherent in requiring an employer to supervise each aspect of an independent contractor's often specialized work.[29] We reached a similar conclusion in Parrish v. Omaha Pub. Power Dist.,[30] in which weinterestinglydiscussed and determined the legal duties of a landowner and general contractor to a subcontractor based upon the same considerations, without relying upon foreseeability.
But in other cases, our law has not been so clear. As noted above, we have stated that as a general proposition, in negligence cases, the duty is always the sameto conform to the legal standard of reasonable conduct in light of the apparent risk.[31] That uncontroversial proposition coexists *916 uneasily with the risk-utility principles set forth above, which did not always include foreseeability and were at first expressly intended to evaluate the duty owed by a landlord to a tenant.[32] Only later did we graft foreseeability onto the rubric[33] and apply it generally beyond the context of premises liability.[34]
The ensuing complications are illustrated by our reasoning in Sharkey v. Board of Regents,[35] in which we relied upon foreseeability in determining a university's legal duty to protect students on its campus from criminal activity. Although invoking our risk-utility test, our decision was grounded entirely in foreseeability. And we reasoned, in the end, that because the evidence showed that violent altercations were not unknown at the location on campus where the plaintiff was attacked, the attack was foreseeable; thus, we held that the university owed a duty "to its students to take reasonable steps to protect against foreseeable acts of violence on its campus and the harm that naturally flows therefrom."[36]
In other words, we reasoned that because the attack at issue in that case was foreseeable, the defendant had a duty to protect against foreseeable acts of violence. Our reasoning was tautological. It is evident that the university had a landowner-invitee duty to protect against foreseeable acts even had the attack in that case not been foreseeable. While we purported to be discussing duty, we were in fact assuming the conclusion we claimed to be proving, and we were actually evaluating the sufficiency of the evidence to sustain a conclusion that the university had breached its duty to take reasonable care.
Our mistake was a common one. As the Restatement notes, in a number of cases, courts have rendered judgments under the rubric of duty that are better understood as applications of the negligence standard to a particular category of recurring facts.[37] But the Restatement disapproves that practice and limits the determination of duty to articulated policy or principle, in order to facilitate more transparent explanations of the reasons for a no-duty ruling and to protect the traditional function of the jury as a fact finder.[38] Simply put, whether a duty exists is a policy decision, and a lack of foreseeable risk in a specific case may be a basis for a no-breach determination, but such a ruling is not a no-duty determination.[39] As the Wisconsin Supreme Court explained, in a negligence case, a defendant's conduct should be examined "`"not... in terms of whether ... there is a duty to [perform] a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances."'"[40]
*917 To summarize: Under the Restatement (Third), foreseeable risk is an element in the determination of negligence, not legal duty. In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence. The extent of foreseeable risk depends on the specific facts of the case and cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable. Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter.[41] And if the court takes the question of negligence away from the trier of fact because reasonable minds could not differ about whether an actor exercised reasonable care (for example, because the injury was not reasonably foreseeable), then the court's decision merely reflects the one-sidedness of the facts bearing on negligence and should not be misrepresented or misunderstood as involving exemption from the ordinary duty of reasonable care.[42]
We find the reasoning of the Restatement (Third), and our fellow courts that have endorsed it, to be persuasive.[43] The circumstances of this case illustrate how incorporating foreseeability into a duty analysis can confuse the issues. Here, it is not disputed that LPS owed C.B. a duty of reasonable care. The duty of instructors to supervise and protect students is well established under the Restatement (Second) of Torts,[44] the Restatement (Third) of Torts,[45] and our current case law.[46] Instead, the question is whether Siems' assault of C.B. was reasonably foreseeable. That determination involves a fact-specific inquiry into the circumstances that might have placed LPS on notice of the possibility of the assault. Stated another way, it requires us to ask what LPS employees knew, when they knew it, and whether a reasonable person would infer from those facts that there was a danger. Those are factual inquiries that should not be reframed as questions of law.
Under the Restatement view, the basic analysis remains the same. The factual question is the same. But, it is properly reframed as a question of fact. LPS owed C.B. a duty of reasonable care. Did LPS, under the facts and circumstances of the case, conduct itself reasonably? Or, more precisely, was Siems' assault of C.B. reasonably foreseeable, such that LPS' duty of reasonable care required it to act to forestall that risk? Such an approach properly recognizes the role of the trier of fact and requires courts to clearly articulate the reasons, other than foreseeability, that might support duty or no-duty determinations.[47] And it correctly examines the defendant's conduct, not in terms of whether it had a "duty" to take particular actions, but instead in terms of whether its conduct breached its duty to exercise the care that would be exercised by a reasonable person under the circumstances.[48]
We do not view our endorsement of the Restatement (Third) as a fundamental *918 change in our law. It is better understood as rearranging the basic questions that are posed by any negligence case and making sure that each question has been put in its proper place. But it does not change those questions. To say, as we have in the past, that a defendant had no duty, under particular circumstances, to foresee a particular harm is really no different from saying that the defendant's duty to take reasonable care was not breached, under those circumstances, by its failure to foresee the unforeseeable.
But placing foreseeability in the context of breach, rather than duty, properly charges the trier of fact with determining whether a particular harm was, on the facts of the case, reasonably foreseeablealthough the court reserves the right to determine that the defendant did not breach its duty of reasonable care, as a matter of law, where reasonable people could not disagree about the unforeseeability of the injury. We have often said that "`"`[t]he risk reasonably to be perceived defines the duty to be obeyed[,]'"'"[49] but that proposition should now be understood as explaining how foreseeability helps define what conduct the standard of care requires under the circumstances and whether the conduct of the alleged tort-feasor conforms to that standard. These are determinations reserved for the finder of fact.[50] And the factors of our risk-utility test, which we have employed to determine the existence of a duty, are better applied as possible considerations in determining whether an actor's conduct was negligent.[51] As the Restatement (Third) explains:
A person acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm.[52]
For the foregoing reasons, we find the clarification of the duty analysis contained in the Restatement (Third) of Torts, § 7, to be compelling, and we adopt it.[53] We expressly hold that foreseeability is not a factor to be considered by courts when making determinations of duty.[54]

FORESEEABILITY IN PRESENT CASE
We apply Restatement (Third) principles to our analysis of this case, to provide the parties and the district court with clearer guidance of how the case should proceed on remand, and to establish Restatement (Third) precedent to guide other cases. We note, however, that our disposition of this appeal would have been the same regardless.
As noted above, A.W. argues that LPS had a duty to protect C.B. from the danger of sexual assault, that the sexual assault of C.B. was reasonably foreseeable, and that LPS' response was inadequate to that foreseeable danger. Primarily, A.W. contends that the neighborhood in which Arnold Elementary School is located was sufficiently dangerous to place LPS on notice of a danger that a student could be sexually assaulted and that the LPS employees *919 who saw Siems on the day of the assault should have foreseen the danger that he represented.
And, as we also noted above, LPS' relationship with C.B. was such that LPS owed a duty of reasonable care with regard to risks that arose within the scope of that relationship. There is no argument in this case that there is any countervailing principle or policy warranting a modification of that duty in this class of cases. So, the parties' foreseeability arguments are properly framed as disputing whether, considering the foreseeable likelihood of harm, LPS exercised reasonable care under all the circumstances.[55] If, in light of all the facts relating to LPS' conduct, reasonable minds could differ as to whether the conduct lacked reasonable care, it is the function of the finder of fact to make that determination, and summary judgment was improper.[56] And it bears repeating that in an appeal from a summary judgment, we view the evidence in the light most favorable to the nonmoving party, A.W.[57]
Nonetheless, to begin with, we are not persuaded by A.W.'s evidence of criminal behavior in the area of the school. Evidence of prior criminal activity is a necessary component in the totality of the circumstances which must be considered in determining foreseeability.[58] Several instances of similar criminal activity in a fairly contiguous area during a limited timespan may make other such incidents foreseeable, implicating a responsible party's duty to take reasonable care.
But the only evidence A.W. presents in this regard is a call log from the Lincoln Police Department for a three-block area near Arnold Elementary School during 2001 to 2005. There were a great many calls for police assistance made in the year before C.B. was assaulted, including incidents of vandalism, an assault, and a report of a suspicious person at Arnold Elementary School. And other, more sexually related crimes were reported in the neighborhood. But few of those incidents took place during the school day. And there was nothing that should have suggested to LPS that a sexual assault was likely in the school building.
The evidence in this case is far different from that presented in other cases, in which we have found a basis for determining that criminal activity was foreseeable. This is not, for instance, a case such as Doe v. Gunny's Ltd. Partnership,[59] in which the plaintiff had been sexually assaulted in a parking garage, and in which there was evidence of crimes reported in the same building or one of the businesses located in the building. This was not a case in which a substantial number of similar incidents had occurred on the premises.[60] Nor is this a case in which the defendant had been on notice of the behavior of a particular assailant.[61] In *920 short, there was not sufficient evidence of prior criminal activity to necessarily make the intrusion of a sexual predator at this particular elementary school foreseeable. In order to make a risk of attack foreseeable, the circumstances to be considered must have a direct relationship to the harm incurred,[62] and that relationship is lacking here.
After Siems entered the building, however, reasonable minds could differ as to whether LPS' initial failure to note his presence, and response to his presence, satisfied its duty of reasonable care. The sequence of events presented by the evidence is essentially undisputed. Siems was spotted by a number of LPS employees, more than one of whom observed that Siems seemed out of place. While each of them responded to the threat that they recognized Siems represented, none of them effectively made sure that Siems did not make contact with a student. Specifically, they did not keep track of Siems' location and permitted him to evade them. Nor did they prevent C.B. from entering the restroom, alone, while Siems' whereabouts were unknown. And reasonable minds could differ as to whether Siems' assault of C.B. was a foreseeable result of those failures. These facts, taken in the light most favorable to A.W.,[63] establish a genuine issue of material fact as to whether LPS breached the duty of reasonable care it owed C.B. For that reason, A.W.'s first three assignments of error have merit and A.W. is entitled to a full trial to resolve these respective issues.

SAFETY AND SECURITY PROCEDURES
Because we are remanding this cause for further proceedings, we will address one aspect of A.W.'s fourth assignment of error. In support of her fourth assignment of error, A.W. argues that the safety and security plan in place at the time of the assault did not comply with relevant state law. Under regulations promulgated by the Nebraska Department of Education, each school system is required to have "a safety and security plan for the schools in the system. The plan addresses the safety and security of students, staff, and visitors."[64] And that plan is to be reviewed annually by a school safety and security committee and by outside parties.[65]
A.W. argues that the plan in place for LPS and Arnold Elementary School did not satisfy this regulation. But to begin with, it is not clear precisely how this argument helps establish A.W.'s claim for relief. A statute, for instance, may give rise to a tort duty to act in the manner required by the statute where the statute is enacted to protect a class of persons which includes the plaintiff, the statute is intended to prevent the particular injury that has been suffered, and the statute is intended by the Legislature to create a private liability as distinguished from one of a public character.[66] Although we have suggested that a regulation may be relevant as evidence of the standard of care,[67] we have never held that an administrative regulation can similarly expand the scope of tort liability beyond the general duty to exercise reasonable care.
*921 In this case, the regulations at issue are promulgated as accreditation standards, not standards for tort liability,[68] and contain no explicit qualitative requirements. They plainly do not give rise to a tort duty beyond the duty of reasonable care that was discussed above. They could, however, serve as relevant evidence of the standard of care and whether the standard of care was breached. But at this juncture, it is neither necessary nor proper to determine in this appeal whether these statutes and regulations would be admissible evidence at trial. The admissibility will be determined by the context in which such evidence is offered (if offered) at trial.

CONCLUSION
Therefore, we find no merit to A.W.'s narrow argument that for purposes of the court's duty analysis, Arnold Elementary School's safety and security policy was legally inadequate. But we do find a genuine issue of material fact with respect to A.W.'s allegation that LPS breached its duty of reasonable care to C.B. Specifically, we hold that pursuant to the principles articulated in the Restatement (Third) of Torts, foreseeability is not part of the duty analysis performed by the court, but is part of the breach analysis performed by the finder of fact. And while the evidence of prior criminal activity in the neighborhood of Arnold Elementary School was not sufficient to support a conclusion that a sexual assault on the premises was reasonably foreseeable, there was sufficient evidence for reasonable minds to differ as to whether Siems' assault of C.B. was a foreseeable consequence of LPS' failure to initially note Siems' entry into the school or to carefully monitor Siems, and C.B., after it was determined that Siems had entered the school.
Therefore, we reverse the district court's summary judgment and remand the cause for further proceedings with respect to LPS' allegedly negligent conduct after Siems entered Arnold Elementary School.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
STEPHAN, J., not participating.
NOTES
[1] See Neb.Rev.Stat. § 13-901 et seq. (Reissue 2007 & Supp.2009).
[2] See § 13-910(2).
[3] Erickson v. U-Haul Internat., 278 Neb. 18, 767 N.W.2d 765 (2009).
[4] Id.
[5] See Ehlers v. State, 276 Neb. 605, 756 N.W.2d 152 (2008).
[6] Doe v. Gunny's Ltd. Partnership, 256 Neb. 653, 593 N.W.2d 284 (1999).
[7] Id.
[8] See Heins v. Webster County, 250 Neb. 750, 552 N.W.2d 51 (1996).
[9] See, e.g., Hughes v. Omaha Pub. Power Dist., 274 Neb. 13, 735 N.W.2d 793 (2007).
[10] See id.
[11] See, e.g., Sharkey v. Board of Regents, 260 Neb. 166, 615 N.W.2d 889 (2000).
[12] See Knoll v. Board of Regents, 258 Neb. 1, 601 N.W.2d 757 (1999).
[13] Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2010).
[14] Id., § 7, comment j.
[15] See, Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 4, 734 P.2d 1326, 1327-28 (1987); W. Jonathan Cardi, Purging Foreseeability: The New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts, 58 Vand. L. Rev. 739 (2005).
[16] See Gipson v. Kasey, 214 Ariz. 141, 150 P.3d 228 (2007).
[17] See Cardi, supra note 15.
[18] See, Gipson, supra note 16; Cardi, supra note 15.
[19] See Schmidt v. Omaha Pub. Power Dist., 245 Neb. 776, 515 N.W.2d 756 (1994).
[20] See Cardi, supra note 15.
[21] Id.
[22] Gipson, supra note 16, 214 Ariz. at 144, 150 P.3d at 231, citing Cardi, supra note 15; Restatement (Third) of Torts, supra note 13, § 7.
[23] Restatement (Third) of Torts, supra note 13, § 7(a).
[24] Id., § 7(b).
[25] See id., § 7, comment b.
[26] See id., comment j. See, also, Gipson, supra note 16.
[27] Thompson v. Kaczinski, 774 N.W.2d 829 (Iowa 2009).
[28] Van Fossen v. MidAmerican Energy Co., 777 N.W.2d 689 (Iowa 2009).
[29] See id.
[30] Parrish v. Omaha Pub. Power Dist., 242 Neb. 783, 496 N.W.2d 902 (1993).
[31] See, e.g., Moglia v. McNeil, 270 Neb. 241, 700 N.W.2d 608 (2005); Parrish, supra note 30.
[32] See C.S. v. Sophir, 220 Neb. 51, 368 N.W.2d 444 (1985).
[33] See Schmidt, supra note 19.
[34] See Popple v. Rose, 254 Neb. 1, 573 N.W.2d 765 (1998).
[35] Sharkey, supra note 11.
[36] Id. at 182, 615 N.W.2d at 902.
[37] Restatement (Third) of Torts, supra note 13, comment i.
[38] Id., comment j. Accord Thompson, supra note 27.
[39] See, Thompson, supra note 27; Behrendt v. Gulf Underwriters Ins. Co., 318 Wis.2d 622, 768 N.W.2d 568 (2009); Gipson, supra note 16.
[40] See Behrendt, supra note 39, 318 Wis.2d at 634, 768 N.W.2d at 574.
[41] Restatement (Third) of Torts, supra note 13, comment j.
[42] See id., comment i.
[43] See, Thompson, supra note 27; Behrendt, supra note 39; Gipson, supra note 16.
[44] See Restatement (Second) of Torts §§ 314A and 320, comment b. (1965).
[45] See Restatement (Third) of Torts, supra note 13, § 40(b)(5) (Proposed Final Draft No. 1, 2005).
[46] See, e.g., Fu v. State, 263 Neb. 848, 643 N.W.2d 659 (2002).
[47] See Gipson, supra note 16.
[48] See Behrendt, supra note 39.
[49] E.g. Knoll, supra note 12, 258 Neb. at 7, 601 N.W.2d at 763.
[50] See Wilke v. Woodhouse Ford, 278 Neb. 800, 774 N.W.2d 370 (2009).
[51] See, e.g., Heins, supra note 8.
[52] Restatement (Third) of Torts, supra note 13, § 3 at 29.
[53] See Thompson, supra note 27.
[54] See Gipson, supra note 16. See, also, Thompson, supra note 27; Behrendt, supra note 39.
[55] See Restatement (Third) of Torts, supra note 13, § 3.
[56] See id., § 8(b).
[57] See Erickson, supra note 3.
[58] See Doe, supra note 6.
[59] Doe, supra note 6. See, also, Erichsen v. No-Frills Supermarkets, 246 Neb. 238, 518 N.W.2d 116 (1994).
[60] See, Knoll, supra note 12 (fraternity hazing); Sacco v. Carothers, 257 Neb. 672, 601 N.W.2d 493 (1999) (bar fight); Hulett v. Ranch Bowl of Omaha, 251 Neb. 189, 556 N.W.2d 23 (1996) (bar fight), overruled, Knoll, supra note 12.
[61] See, e.g., Doe v. Omaha Pub. Sch. Dist., 273 Neb. 79, 727 N.W.2d 447 (2007); Anderson/Couvillon v. Nebraska Dept. of Soc. Servs., 248 Neb. 651, 538 N.W.2d 732 (1995); S.I. v. Cutler, 246 Neb. 739, 523 N.W.2d 242 (1994).
[62] Gans v. Parkview Plaza Partnership, 253 Neb. 373, 571 N.W.2d 261 (1997), overruled Knoll, supra note 12.
[63] See Erickson, supra note 3.
[64] 92 Neb. Admin. Code, ch. 10, § 011.01B (2004).
[65] Id., § 011.01C.
[66] See Claypool v. Hibberd, 261 Neb. 818, 626 N.W.2d 539 (2001).
[67] See Orduna v. Total Constr. Servs., 271 Neb. 557, 713 N.W.2d 471 (2006).
[68] See 92 Neb. Admin. Code, ch. 10, § 001 (2004).