Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/10/2017 08:11 AM CDT

RENE ESSINK ET AL., APPELLEES, V.
CITY OF GRETNA, A MUNICIPAL
CORPORATION, APPELLANT.

___ N.W.2d ___

Filed September 19, 2017.   No. A-16-682.

1. **Constitutional Law: Appeal and Error.** Constitutional interpretation is a question of law on which the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision by the trial court.

2. **Directed Verdict: Evidence.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

3. **Political Subdivisions Tort Claims Act: Jurisdiction.** While not a jurisdictional prerequisite, the filing or presentment of a claim to the appropriate political subdivision is a condition precedent to commencement of a suit under the Political Subdivisions Tort Claims Act.

4. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

5. **Directed Verdict: Evidence.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

6. **Eminent Domain: Words and Phrases.** Inverse condemnation is a shorthand description for a landowner suit to recover just compensation for a governmental taking of the landowner's property without the benefit of condemnation proceedings.

7. **Eminent Domain: Property: Intent.** Inverse condemnation has been characterized as an action or eminent domain proceeding initiated by the property owner rather than the public entity and has been deemed to be available where private property has actually been taken for public use without formal condemnation proceedings and where it appears that there is no intention or willingness of the taker to bring such proceedings.

8. **Constitutional Law: Eminent Domain: Damages.** Because the governmental entity has the power of eminent domain, the property owner cannot compel the return of property taken; however, as a substitute, the property owner has a constitutional right to just compensation for what was taken.

9. **Constitutional Law: Eminent Domain: Words and Phrases.** Under the Nebraska Constitution, the requirement that property was taken or damaged "for public use" means that the taking or damage must be the result of the governmental entity's exercise of the right of eminent domain.

10. **Eminent Domain: Damages.** Not all damage to property by a governmental entity in the performance of its duties occurs as a result of the exercise of eminent domain.

11. **Eminent Domain: Damages: Proximate Cause: Proof.** The initial question in an inverse condemnation case is not whether the actions of the governmental entity were the proximate cause of the plaintiff's damages. Instead, the initial question is whether the governmental entity's actions constituted the taking or damaging of property for public use. That is, it must first be determined whether the taking or damaging was occasioned by the governmental entity's exercise of its power of eminent domain. Only after it has been established that a compensable taking or damage has occurred should consideration be given to what damages were proximately caused by the taking or damaging for public use.

12. **Eminent Domain: Property: Proof.** In order to meet the initial threshold that the property has been taken or damaged for public use, it must be shown that there was an invasion of property rights that was intended or was the foreseeable result of authorized governmental action.

13. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

14. **Political Subdivisions Tort Claims Act.** The Political Subdivisions Tort Claims Act is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees.

15. **Political Subdivisions Tort Claims Act: Notice.** With regard to a claim's content, substantial compliance with the statutory provisions

supplies the requisite and sufficient notice to a political subdivision under the Political Subdivisions Tort Claims Act.

16. ____: ____. The written claim required by the Political Subdivisions Tort Claims Act notifies a political subdivision concerning possible liability for its relatively recent act or omission, provides an opportunity for the political subdivision to investigate and obtain information about its allegedly tortious conduct, and enables the political subdivision to decide whether to pay the claimant's demand or defend the litigation predicated on the claim made.

Appeal from the District Court for Sarpy County: MAX KELCH, Judge, and PAUL D. MERRITT, JR., Judge, Retired. Vacated in part, and in part reversed and remanded with directions.

Thomas J. Culhane and Patrick R. Guinan, of Erickson & Sederstrom, P.C., for appellant.

Melanie J. Whittamore-Mantzios, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellees.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

## INTRODUCTION

Rene Essink, Brandon Henry and Amanda Henry, and Michael Foged and Catherine Howard, now known as Catherine Foged (collectively appellees), brought an inverse condemnation action and a negligence action under the Political Subdivisions Tort Claims Act (the Tort Claims Act) against the City of Gretna (City) as a result of two sanitary sewer backups into their homes. A jury found in favor of appellees on the inverse condemnation claims and awarded damages. The trial court dismissed the negligence action under the Tort Claims Act as to Essink and the Henrys. Following a bench trial, the court found that the Fogeds had complied with the filing requirements of the Tort Claims Act and that the City negligently caused the backups and awarded damages. The City appeals from the judgment on the jury

verdict and the trial court's order from the bench trial. On the inverse condemnation action, we conclude that the trial court should have granted a directed verdict in favor of the City, and therefore, we vacate the jury's verdict, and reverse the judgment of the trial court and remand the matter with directions to enter judgment in favor of the City. On the Fogeds' negligence action under the Tort Claims Act, we determine that the Fogeds did not comply with the filing requirements of the Tort Claims Act, and therefore, we reverse the trial court's order and remand the matter to the trial court with directions to dismiss.

## BACKGROUND

The City has a wastewater collection system that collects sewage from residences and businesses and uses gravity to direct the collected sewage to a pumping station or treatment facility. Residents connect to the City's collection system through private service connections that run from their properties to the City's line.

In July and August 2010, appellees all lived on Meadow Lane in Gretna, Nebraska. Their homes were located near the top of the gravitational line of the City's sewage collection system.

On July 23, 2010, sewage from the City's collection system backed up into Essink's and the Fogeds' residences. Richard Andrews, the City's utility superintendent, responded and investigated by lifting the covers to the two manholes closest to the residences and checking the flow of water. He discovered that there was a blockage between the two manholes. Andrews used the City's sewer "jet" to clear the blockage. He then checked manholes down the gravitational line and observed that the collection system was clear and flowing. Andrews was unable to determine what caused the blockage. Andrews checked the manholes on Meadow Lane for several days after the July 23 backup to make sure the system was flowing, and he did not observe any further blockages or issues with the flow.

On August 16, 2010, sewage from the City's collection system backed up into appellees' residences. Andrews responded again and investigated to determine where the blockage was located. He started by checking the manholes closest to the residences, which was where he had discovered the blockage on July 23. Andrews did not find a blockage between those manholes or any manholes on Meadow Lane. Andrews continued checking manholes down the gravitational line until he found the blockage several blocks away on Cherokee Drive. The City hired Utility Services Group (USG) to jet the line and clear the blockage. When the blockage was cleared, Andrews checked manholes down the gravitational line and observed that the collection system was clear and flowing. After the August 16 backup, the City also had USG conduct a "televised" video inspection on an area of the City's sewerlines, which included Meadow Lane.

Sometime after the July 23 and August 16, 2010, backups, Michael Foged's father hand delivered two envelopes to an employee of the City clerk's office on his son's behalf. The envelopes contained bills the Fogeds received from the business they hired to clean up their home after the backups.

In June 2011, appellees filed a written tort claim addressed and delivered to the City's clerk, pursuant to the Tort Claims Act. In October 2011, before the 6-month claim period expired, appellees filed a complaint in the district court for Sarpy County containing an inverse condemnation claim. In December 2014, appellees filed an amended complaint adding a negligence claim under the Tort Claims Act.

The City moved for summary judgment with respect to appellees' tort claim. The district court determined that the amended complaint related back to the original complaint and that the tort claim was therefore not time barred by the 2-year statute of limitations. The district court then concluded that because the original complaint was filed before the 6-month claim period under the Tort Claims Act expired, appellees failed to comply with all conditions of the Tort

Claims Act before filing their complaint. However, the district court found that questions of fact existed as to whether the cleaning bills Michael Foged's father delivered to the City clerk's office constituted a "claim" properly filed under the Tort Claims Act. Accordingly, the district court granted the City's summary judgment motion with respect to Essink's and the Henrys' tort claims, but overruled the motion as to the Fogeds' tort claim.

A jury trial was held on appellees' inverse condemnation claim. Andrews, the City's utility superintendent, testified that prior to July 2010, there were no reported sewer backups into any homes on Meadow Lane or reports of any other issues with the City's collection system on Meadow Lane. Stephen Sherry, a City employee with over 35 years of experience working with the City's sewer system, testified that the July 23 and August 16 backups were the only sewer backups on Meadow Lane that he was aware of.

Andrews and Sherry also testified to the City's regular inspection, maintenance, and repair procedures for the sewage collection system. The City maintains a list of manholes that are checked daily to make sure water is flowing in the system. The manholes on the list are where there are large collection points, low spots, or problem areas where blockages have occurred. The manholes on Meadow Lane and Cherokee Drive were not on this list prior to the July and August 2010 backups. Andrews testified that the manholes on Meadow Lane were added to the list after the August 16 backup and that they are checked daily.

In addition to checking the manholes on the list on a daily basis, the City also conducts random inspections of manholes throughout the City. The City also tries to jet out all the sewerlines throughout the City on an annual basis, depending on budget constraints.

Greg MacLean, a civil engineer who testified for appellees, stated that in his opinion, the City's practice of checking certain manholes on a daily basis indicated that it knew it had

a problem with the sewer system. He testified that knowing there was a problem and not doing anything to address the problem makes it certain that there will eventually be a backup of some kind.

MacLean testified that in the video taken by USG of the sewerlines, he observed broken and disjointed or offset pipes, as well as tree roots in the line. He testified that in his opinion, the blockages at issue were caused by the condition of the lines. He testified that broken and disjointed pipes reduce the flow and reduce the carrying capacity of the pipes. MacLean further explained that during times when the flow increases from increased usage or during wet weather, the capacity of the pipes can be exceeded, resulting in a sewer backup upstream.

MacLean also testified that backups can also be caused by foreign objects users put into the collection system and that the City has no control over nor can it predict what will be put into the system. He also admitted that blockages in a sewage collection system can occur despite the best practices. He acknowledged that when he was the Lincoln, Nebraska, sewer system supervisor, Lincoln experienced an average of 20 backups per year despite his best maintenance efforts.

Steven Perry, the City's civil engineering consultant for over 30 years, testified that he did not see anything in the USG video that would have caused the sewer backups on Meadow Lane. He testified that offset pipes and broken or cracked pipes would not cause a blockage in the line. He acknowledged that a leaky joint or an infiltration into the system, such as roots, allows water into the system which reduces the carrying capacity of the pipes. Perry testified, however, that there was nothing in the system itself that would have caused a backup.

Perry testified that there is no way to predict when or where a blockage is going to occur. He further testified that in over 30 years as an engineer dealing with sewer systems in various communities, he was not aware of any sewer system that never has any blockages.

The City made a motion for directed verdict at the close of appellees' evidence, which the court denied. Following the presentation of evidence by both parties, the City renewed its motion for directed verdict, which was again denied. The jury returned a verdict in favor of appellees on the inverse condemnation claim, and the district court entered judgment on the verdict. The City made a motion for judgment notwithstanding the verdict, which the district court denied.

Following the jury trial on the inverse condemnation claim, a bench trial was held on the Fogeds' tort claim. The district court determined that the cleaning bills that were presented to the City clerk's office constituted a "claim" under the Tort Claims Act, that the Fogeds substantially complied with the Tort Claims Act, and that the City negligently caused the sewer backups. The court awarded damages.

## ASSIGNMENTS OF ERROR

The City assigns that the trial court erred in (1) failing to direct a verdict in the City's favor on appellees' inverse condemnation claims; (2) failing to grant the City judgment notwithstanding the verdict on appellees' inverse condemnation claims; (3) submitting the takings question to the jury; (4) improperly instructing the jury on appellees' inverse condemnation claims; (5) accepting the jury's verdict, which included a finding that the July 23 and August 10, 2010, backups constituted a taking; (6) finding that the Fogeds filed a "claim" with the proper city official; (7) finding that the Fogeds complied with the Tort Claims Act's filing requirements by delivering cleaning bills to an employee of the City clerk's office but who was not the person whose duty it was to maintain the City's records; (8) finding that the cleaning bills the Fogeds delivered to the City constituted a "claim" under the Tort Claims Act; (9) finding that the City was negligent in causing the backups that occurred at the Fogeds' residence on July 23 and August 16; and (10) finding that the backups were proximately caused by the City's negligence.

## STANDARD OF REVIEW

[1] Constitutional interpretation is a question of law on which the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision by the trial court. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013).

[2] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Winder v. Union Pacific RR. Co.*, 296 Neb. 557, 894 N.W.2d 343 (2017).

[3] While not a jurisdictional prerequisite, the filing or presentment of a claim to the appropriate political subdivision is a condition precedent to commencement of a suit under the Tort Claims Act. *Jessen v. Malhotra*, 266 Neb. 393, 665 N.W.2d 586 (2003).

## ANALYSIS

*Inverse Condemnation Claim.*

The City's first five assignments of error relate to the jury trial on appellees' inverse condemnation action. Included in these assignments of error is the City's allegation that the trial court erred in failing to direct a verdict in its favor. We address this assignment of error first.

[4,5] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Winder v. Union Pacific RR. Co., supra*. A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Id.*

[6] The City argues that based on the evidence presented at trial, there was only one conclusion that could be drawn and a directed verdict should have been granted in its favor on the inverse condemnation claim. The right to bring an inverse condemnation action derives from Neb. Const. art. I, § 21, which provides: "The property of no person shall be taken or damaged for public use without just compensation therefor." The 5th Amendment to the U.S. Constitution, made applicable to the states through the 14th Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." Inverse condemnation is a shorthand description for a landowner suit to recover just compensation for a governmental taking of the landowner's property without the benefit of condemnation proceedings. *6224 Fontenelle Blvd. v. Metropolitan Util. Dist.*, 22 Neb. App. 872, 863 N.W.2d 823 (2015).

[7,8] Inverse condemnation has been characterized as an action or eminent domain proceeding initiated by the property owner rather than the public entity and has been deemed to be available where private property has actually been taken for public use without formal condemnation proceedings and where it appears that there is no intention or willingness of the taker to bring such proceedings. *Id.* Because the governmental entity has the power of eminent domain, the property owner cannot compel the return of property taken; however, as a substitute, the property owner has a constitutional right to just compensation for what was taken. *Id.*

[9,10] Under the Nebraska Constitution, the requirement that property was taken or damaged "for public use" means that the taking or damage must be the result of the governmental entity's exercise of the right of eminent domain. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). Not all damage to property by a governmental entity in the performance of its duties occurs as a result of the exercise of eminent domain. *Id.*

In *Henderson v. City of Columbus, supra*, the plaintiffs sued the defendant after raw sewage flooded into their home after a heavy rainstorm. The plaintiffs claimed that the flooding damaged their home and was the result of a malfunction of the city-run sanitary sewage system. The complaint alleged several theories of recovery, including inverse condemnation. After a bench trial, the court found in favor of the defendant and dismissed the plaintiffs' complaint, determining that the plaintiffs failed to prove that the defendant's actions or inactions were the proximate cause of their damages. On appeal, this court concluded that the defendant's actions proximately caused the backups and reversed the portion of the trial court's order which dismissed the inverse condemnation claim and remanded the cause for a determination of damages. Although for reasons different from those of the trial court, the Nebraska Supreme Court on further review held that the plaintiffs failed to establish an inverse condemnation claim and affirmed the trial court's judgment in favor of the defendant. *Id*.

[11,12] In its opinion, the Nebraska Supreme Court stated that the focus on proximate cause was premature and set forth that

> [t]he initial question in an inverse condemnation case is not whether the actions of the governmental entity were the proximate cause of the plaintiff's damages. Instead, the initial question is whether the governmental entity's actions constituted the taking or damaging of property for public use. That is, it must first be determined whether the taking or damaging was occasioned by the governmental entity's exercise of its power of eminent domain. Only after it has been established that a compensable taking or damage has occurred should consideration be given to what damages were proximately caused by the taking or damaging for public use.

*Id.* at 489, 827 N.W.2d at 492. In order to meet the initial threshold that the property has been taken or damaged for

public use, it must be shown that there was an invasion of property rights that was intended or was the foreseeable result of authorized governmental action. See *id.*

In analyzing whether the flooding in *Henderson v. City of Columbus, supra*, was an invasion of property rights that was intended or foreseeable, the court considered the U.S. Supreme Court case of *Arkansas Game and Fish Com'n v. United States*, 568 U.S. 23, 133 S. Ct. 511, 184 L. Ed. 2d 417 (2012). Specifically, it noted:

> At issue in *Arkansas Game and Fish Com'n* was "whether government actions that cause repeated floodings must be permanent or inevitably recurring to constitute a taking of property." 133 S. Ct. at 518. The Court concluded that government-induced "recurrent floodings, even if of a finite duration, are not categorically exempt from Takings Clause liability." 133 S. Ct. at 515. The temporary nature of the flooding at issue in *Arkansas Game and Fish Com'n* did not automatically exclude it from being a compensable event under the Takings Clause and the order of dismissal therein was reversed and the cause remanded. While time or duration was the relevant factor in determining the existence of a compensable taking at issue in *Arkansas Game and Fish Com'n,* the Court further stated that "[a]*lso relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.*" 133 S. Ct. at 522. This additional factor of intention or foreseeability is of particular importance in the case before us.

*Henderson v. City of Columbus*, 285 Neb. 482, 492, 827 N.W.2d 486, 494 (2013) (emphasis supplied).

The *Henderson* court also recognized that the *Arkansas Game and Fish Com'n* Court stated, in regard to the intentional or foreseeable results of the acts of the governmental entity, that "'a property loss compensable as a taking only results when the government intends to invade a protected property

interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action."'" 285 Neb. at 493, 827 N.W.2d at 495.

The *Henderson* court further noted that Nebraska case law and that of other states indicate flooding may be a compensable taking when it is frequent or recurring. The *Henderson* court stated that this is consistent with the statement in *Arkansas Game and Fish Com'n v. United States, supra*, that intention or foreseeability is a factor in determining whether there has been a taking, because the frequency of flooding could indicate that the taking or damaging of property is a known or foreseeable result of government action for public use.

The *Henderson* court concluded that the plaintiffs failed to establish the threshold element that their property was taken or damaged for public use by the defendant in the exercise of its power of eminent domain. The court relied on the district court's finding that no evidence existed to show that the plaintiffs had suffered property damage as a result of recurring, permanent, or chronic sewer backups, or that the damage was intentionally caused by the defendant. The court concluded that the district court's findings supported a conclusion that this was not a case where the defendant exercised its right of eminent domain, because when the defendant took action, there had not been recurring sewer backup, nor was it known or foreseeable that the defendant's action would take or damage private property. *Id*. It further stated that the plaintiffs did not present evidence that the defendant knew damage would occur or could have foreseen that its actions could cause damage to private property.

We conclude that *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013), is instructive in the present case and that therefore, the dispositive issue is whether the backups constituted a taking or damaging of property for public use. As stated in *Henderson*, in order to meet this initial threshold, appellees had to show that the invasion of property rights was

intended or was the foreseeable result of authorized governmental action. *Henderson* also indicated that a flooding case may be a compensable taking when it is frequent or recurring, because the frequency is indicative that the taking or damaging of property was known or foreseeable.

In the present case, the sewer backups were not frequent or recurring. The evidence showed that there were two backups which occurred several weeks apart as a result of two blockages at different areas of the sewer system. The first backup for which appellees claim damages occurred on July 23, 2010. After the backup was reported to the City, Andrews located a blockage in between the two manholes closest to appellees' homes. He jetted the sewerline and cleared the blockage. Andrews then checked manholes down the gravitational line and observed that the collection system was clear and flowing. He checked the manholes on Meadow Lane for several days after the July 23 backup to make sure the system was flowing, and he did not observe any further blockages or issues with the flow.

The evidence was undisputed that no backups occurred on Meadow Lane before July 2010. Sherry, who had over 35 years of experience working with the City's sewer system, testified that besides the two backups at issue in this case, he was aware of only one other sewer backup that occurred in 2007 on a different street. Andrews, the City's utility superintendent, testified that prior to July 2010, there were no reported sewer backups into any homes on Meadow Lane or reports of any other issues with the City's collection system on Meadow Lane. Andrews also testified that there had been only one other backup into a basement other than the ones at issue.

Michael Foged testified that he moved into his house in July 2009 and that he had no backups prior to July 2010. Brandon Henry testified that he had been in his house since 2006 and had no backup problems before July 2010. Similarly, Essink moved into her house in 2001 and had no backups prior to July 2010.

There was evidence that a minor backup occurred at appellees' homes a few days before July 23, 2010, but there was no evidence that this backup was caused by a blockage on Meadow Lane or anywhere in the City's sewer system. Michael Foged and Brandon Henry testified that water came out of their basement drains on July 19 and then receded. Essink testified that her toilet overflowed on the same day. Michael Foged called a plumber who indicated the Fogeds' personal line was clear. Michael Foged also called the City, and Andrews came out and checked the closest manhole and told him there was no blockage. Essink called a plumber who saw no problem with her personal line.

On August 16, 2010, the second backup for which appellees claim damages occurred. Andrews responded after the backup was reported and investigated to determine where the blockage was located. He started by checking the manholes closest to the residences, which was where he had discovered the blockage on July 23. Andrews did not find a blockage between those manholes or any manholes on Meadow Lane. Andrews continued checking manholes down the gravitational line until he found the blockage several blocks away on Cherokee Drive. The City hired USG to jet the line and clear the blockage. When the blockage was cleared, Andrews checked manholes down the gravitational line and observed that the collection system was clear and flowing.

The backup on August 16, 2010, was the second backup on Meadow Lane that was caused by a blockage in the City's sewer system. It was the first backup on Meadow Lane caused by a blockage that was several blocks away.

There was no evidence presented of other backups into appellees' homes besides those in July and August 2010. There was limited evidence of one other backup that occurred into someone else's home in 2007, but it did not take place on Meadow Lane. Accordingly, appellees failed to present evidence of frequent or recurring backups, and failed to prove that

the City knew or could have foreseen that damage would occur to appellees' property.

Appellees argue the City had sufficient knowledge to make it foreseeable that sewer backups would occur based upon its allegedly inadequate method of maintenance and operation of the system and its list of manholes that were checked daily. First, the manhole list does not prove foreseeability: those manholes were checked daily because they were large collection points, low spots in the sewerline, or areas where some sort of blockage had occurred in the past. The manholes where the blockages occurred in the instant case were not on the list. Second, the possibility of backups occurring somewhere in Gretna due to inadequate maintenance and operation is not sufficient to prove that the City knew or could foresee that a backup was going to occur at appellees' properties. In *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013), the court quoted with approval *City of Dallas v. Jennings*, 142 S.W.3d 310 (Tex. 2004), which held that before a governmental entity may be held liable for an intentional taking, the claimant must show that the government "'knows that a *specific act* is causing identifiable harm'" or "'knows that the *specific property damage* is substantially certain to result from an authorized government action.'" 285 Neb. at 494, 827 N.W.2d at 495 (emphasis supplied). Appellees had to prove that the City knew or could have foreseen that damage would occur to appellees' property, and it failed to do so. Further, as previously discussed, there was no evidence of frequent or recurring backups at appellees' homes, on Meadow Lane, or anywhere in Gretna.

Absent evidence of frequent or recurring sewer backups in the past, appellees failed to prove the threshold issue of whether the backups were intended or were the foreseeable result of authorized governmental action. Accordingly, we conclude appellees failed to prove that the backups constituted a taking or damaging of property for public use. We conclude

that the district court erred in failing to grant the City's motion for directed verdict.

[13] The City also assigns that the trial court erred in submitting the question of whether a taking occurred to the jury. It relies on *6224 Fontenelle Blvd. v. Metropolitan Util. Dist.*, 22 Neb. App. 872, 863 N.W.2d 823 (2015), wherein the court held that the ultimate determination of whether government conduct constitutes a taking or damaging of property is a question of law for the court. We note that *6224 Fontenelle Blvd. v. Metropolitan Util. Dist., supra*, was released after the jury trial in this matter. It was also the first time Nebraska courts had addressed an inverse condemnation action where there had been no physical intrusion or taking of property, but only a damaging of property by virtue of a loss of value to the property. Regardless, because we have concluded that the trial court should have directed a verdict in favor of the City and the case should not have gone to the jury, we need not address whether the trial court erred in submitting the takings question to the jury. Further, we need not address the City's remaining assignments of error that relate to the jury trial on appellees' inverse condemnation claim. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017).

*The Fogeds' Claim Pursuant to
Tort Claims Act.*

We next address the City's assignments of error that relate to the Tort Claims Act, specifically that the Fogeds failed to file a proper claim. The City argues that the Fogeds did not comply with the filing requirements of the Tort Claims Act in two respects: (1) the cleaning bills presented to the City clerk's office did not demand the satisfaction of an obligation and (2) the Fogeds did not deliver the cleaning bills to the proper city official.

[14] The Tort Claims Act is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees. *Jessen v. Malhotra*, 266 Neb. 393, 665 N.W.2d 586 (2003). While not a jurisdictional prerequisite, the filing or presentment of a claim to the appropriate political subdivision is a condition precedent to commencement of a suit under the Tort Claims Act. *Jessen v. Malhotra, supra*. Neb. Rev. Stat. § 13-920(1) (Reissue 2012) provides, in relevant part:

> No suit shall be commenced against any employee of a political subdivision for money on account of damage to or loss of property . . . caused by any negligent or wrongful act or omission of the employee while acting in the scope of his or her office or employment . . . . unless a claim has been submitted in writing to the governing body of the political subdivision within one year after such claim accrued . . . .

[15] The requisite content of a written claim is addressed in Neb. Rev. Stat. § 13-905 (Reissue 2012), which requires that all claims "shall be in writing and shall set forth the time and place of the occurrence giving rise to the claim and such other facts pertinent to the claim as are known to the claimant." With regard to a claim's content, substantial compliance with the statutory provisions supplies the requisite and sufficient notice to a political subdivision. *Jessen v. Malhotra, supra.*

[16] The written claim required by the Tort Claims Act notifies a political subdivision concerning possible liability for its relatively recent act or omission, provides an opportunity for the political subdivision to investigate and obtain information about its allegedly tortious conduct, and enables the political subdivision to decide whether to pay the claimant's demand or defend the litigation predicated on the claim made. *Jessen v. Malhotra, supra.*

We first address the City's argument that the cleaning bills that were delivered to the City clerk's office did not demand

the satisfaction of an obligation. The City relies on *Jessen v. Malhotra, supra*, in support of its argument. In *Jessen,* a physician employed by a county medical clinic allegedly misdiagnosed a patient's heart disease. Two days after seeing the physician, the patient died from a myocardial infarction. The patient's widow sent a letter to the physician stating that her husband had been examined by the physician and implying that the physician negligently failed to diagnose her husband's condition, a condition which led to his death. The letter further stated that the physician's misdiagnosis was "'malpractice'" and that the patient's family was "'very angry.'" *Jessen v. Malhotra*, 266 Neb. at 395, 665 N.W.2d at 589. The Nebraska Supreme Court concluded that the content of the widow's letter was insufficient to satisfy the requirements of a written claim under § 13-905 because it did not make a demand for the satisfaction of any obligation, nor did it convey what relief was sought by the plaintiff. The court found that without a proper demand of the relief sought to be recovered, a written claim fails to accomplish one of its recognized objectives: to allow the political subdivision to decide whether to settle the claimant's demand or defend itself in the course of litigation.

The court in *Jessen v. Malhotra*, 266 Neb. 393, 665 N.W.2d 586 (2003), referred to two cases where the Nebraska Supreme Court had construed the predecessor to § 13-905 to require that a written claim make a demand upon a political subdivision for the satisfaction of an obligation rather than merely alerting the political subdivision to the possibility of a claim. The cases were *Peterson v. Gering Irr. Dist.*, 219 Neb. 281, 363 N.W.2d 145 (1985), and *West Omaha Inv. v. S.I.D. No. 48*, 227 Neb. 785, 420 N.W.2d 291 (1988). *Peterson* was a case in which the claim failed to meet the "demand" requirement. The purported claim gave notice to the political subdivision that it "'failed to deliver water by reason of negligence or omission of duties and responsibilities of the

[political subdivision]'" and that the plaintiffs would hold it liable for "'whatever damages *may result* as a result of failure to deliver water.'" *Peterson v. Gering Irr. Dist.*, 219 Neb. at 283, 284, 363 N.W.2d at 147. The court held that the claim did not make a demand against the political subdivision and therefore did not satisfy the requirements of the Tort Claims Act.

The other case referred to by the *Jessen* court, *West Omaha Inv. v. S.I.D. No. 48, supra*, is a case where the written claim passed statutory muster. The claimant filed a claim pursuant to the Tort Claims Act "'*for the property loss*'" caused in part by the political subdivision's negligence, and thus made a proper demand to the political subdivision. *West Omaha Inv. v. S.I.D. No. 48*, 227 Neb. at 788, 420 N.W.2d at 294 (emphasis supplied). In considering whether the letter sent to the political subdivision met the Tort Claims Act's requirements, the court determined that the court in *Peterson v. Gering Irr. Dist., supra*, was mostly concerned that the plaintiffs made an actual demand upon the defendant. The Supreme Court found that the letter in *West Omaha Inv.* satisfied the Tort Claims Act's requirements, because the letter stated that property loss had occurred and that the defendant was responsible. The *West Omaha Inv.* court stated, "The letter did not merely alert the defendant to the future 'possibility of a claim' for 'whatever damages may result' as in *Peterson*. Rather, the plaintiff stated that 'claim is made' against the defendant for actual property loss caused in part by the defendant's negligence." 227 Neb. at 790, 420 N.W.2d at 295.

In the present case, the Fogeds submitted two envelopes to the City clerk's office after the sewer backups into their home. The first envelope had a bill addressed to Michael Foged from a cleaning and restoration company for work done at the Fogeds' residence. The amount of the bill was $20,257.37. There was also a bill from a plumbing company for $105.93. The second envelope, delivered after the second

backup, included a bill addressed to Michael Foged from the cleaning and restoration company for water damage cleanup at the Fogeds' residence in the amount of $6,944.30.

We conclude that like in *Jessen v. Malhotra, supra*, the cleaning bills here do not meet the statutory requirements of a claim, because the bills do not make a demand on the City for the satisfaction of an obligation or relief sought to be recovered. There were no other documents submitted with the cleaning bills. There was no written document of any sort by the Fogeds. Although the bills show the dates the work was performed, the location of the work, the reason (water damage) for the work, and the specific amount owed for such work, there is no demand made that the City satisfy an obligation. The bills are addressed to the Fogeds, indicating they are responsible for payment of the bills. The bills indicate that they are a result of water damage in the home, but there is no allegation that the City caused the water damage, no reference to the sewer backups, and no indication as to why the City would be responsible for the bills. The only reference to the City is a statement in the bills where it indicates that the Fogeds would be submitting them to the City for payment.

The content of the bills does not satisfy the requirements of § 13-905, and therefore, we reverse the trial court's finding that the cleaning bills delivered to the City clerk's office constituted a "claim" under the Tort Claims Act. Accordingly, the Fogeds failed to comply with a condition precedent to the commencement of a suit under the Tort Claims Act and their claim must be dismissed.

Having concluded that the cleaning bills did not demand the satisfaction of an obligation, we need not discuss whether the cleaning bills were delivered to the proper city official. We also do not need to discuss whether the trial court erred in finding that the City was negligent in causing the backups. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

*In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017).

## CONCLUSION

We conclude that the trial court erred in failing to grant a directed verdict in favor of the City on appellees' inverse condemnation action. Therefore, we vacate the jury's verdict, and reverse the judgment of the trial court and remand the matter to the trial court with directions to enter judgment in favor of the City. We further conclude that the trial court erred in finding that the Fogeds complied with the filing requirements of the Tort Claims Act, and therefore, we reverse the trial court's order in regard to the Fogeds' tort claim and remand the matter to the trial court with directions to dismiss.

Vacated in part, and in part reversed
and remanded with directions.