IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


EAKES V. CITY OF GRAND ISLAND


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


EAKES, INC., APPELLANT,

V.

CITY OF GRAND ISLAND, NEBRASKA, APPELLEE.


Filed July 8, 2025.    No. A-24-671.


Appeal from the District Court for Hall County: RYAN C. CARSON, Judge. Affirmed.

Tanya J. Hansen, of Smith, Johnson, Allen, Connick & Hansen, for appellant.

Kate Q. Martz and J. Michael Hannon, of Baylor, Evnen, Wolfe & Tannehill, L.L.P., for appellee.


PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Eakes, Inc., appeals from the Hall County District Court's order granting summary judgment in favor of the City of Grand Island (City). Eakes argues that the court erred in granting summary judgment in favor of the City and dismissing its claims for negligence, res ipsa loquitor, and inverse condemnation. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

Eakes owns and operates its business, Eakes Office Solutions, on leased property in the City. In December 2019, a segment of one of the City's main sewer lines in an alleyway behind Eakes became blocked. The built-up pressure from the sewer line caused raw sewage to backflow into the basement of Eakes' business causing damage. Mark Miller, the president and CEO of Eakes, immediately notified the City of the sewer backflow. The City investigated the cause of the

- 1 -

sewer backflow and provided Eakes with information on how to file a claim with the City for damages resulting from the City's blocked sewer line. After Eakes filed a claim with the City, the City's insurance carrier hired an independent adjuster to investigate the cause of the blockage. Following the investigation, the City declined Eakes' claim for damages.

After the City declined Eakes' claim, Eakes filed a written claim for damages against the City pursuant to the Political Subdivision Tort Claims Act (PSTCA), which it later withdrew after no final disposition was reached. Eakes ultimately filed a complaint against the City alleging that the City was liable for damages caused by the sewer backflow. More specifically, the complaint alleged that while cleaning the sewer line near Eakes' property, the sewer line became obstructed, which resulted in backflow onto Eakes' property causing damage. Eakes alleged that the City was liable under theories of negligence, res ipsa loquitor, and inverse condemnation. The City filed an answer admitting that it engaged in maintenance on the day of the backflow, but denied it was legally liable for damages resulting from the backflow.

Following discovery, the City filed a motion for summary judgment asserting that there was no genuine issue of material fact as to the claims set forth in the complaint and that the City was entitled to judgment as a matter of law. At a hearing thereon, the district court received evidence including a joint stipulation of the parties; discovery responses; and depositions of Jerom Janulewicz, corporate designee for the City; Miller, Eakes' president and CEO; Steven Sanders, a licensed professional engineer; and Fred Tustin, the City's collection system supervisor in the sewer infrastructure division. The court also considered the respective pleadings filed by each party and the briefs from the parties in support of their arguments.

The evidence indicated that between November 5, 2019, and January 31, 2020, the City began construction of the Grand Island Downtown Sanitary Sewer Rehabilitation Project, wherein sewer lines were relined using a cured-in-place pipe (CIPP) liner. The City hired engineering consultants and project contractors to assist in the installation of the CIPP liner. On November 15 and 16, 2019, the City began installing the CIPP liner in the 8-inch main clay tile sewer line in the alleyway behind Eakes, which is located along 3rd Street, between Cleburn Street and Elm Street. That segment of the City's main sewer line has various lateral lines that connect to the main sewer line and, as relevant to this appeal, has two manholes on each side of the segment of the sewer line referred to as the "Upstream Manhole" and the "Downstream Manhole" which are located approximately 248 feet away from each other, with the flow of water moving from the Upstream Manhole to the Downstream Manhole. Notably, the sewer line becomes an open conduit between the manholes such that water can collect within the manholes outside of the sewer line and begin flowing again into the sewer line on the downstream side of the manhole.

Prior to installing the liner in the sewer line between the manholes, the contractor performed a video inspection of the line on November 15, 2019. The contractor performed a second video inspection the day after that segment of the sewer line was relined. The City performed a third video inspection on December 24, the day after the sewer backflow, as part of the City's investigation into the cause of the backflow.

On December 23, 2019, unrelated to the rehabilitation project, the City completed routine maintenance of the sewer lines between Madison and Jefferson Streets and Second and Third Streets by cleaning the lines using a process called "jetting" in which water is forced through the line. It was during this process that the blockage and backflow occurred.

## 1. Tustin's Deposition Testimony

Tustin testified that on November 15 and 16, 2019, the City's main sewer line was relined with a PVC liner as part of the City's sewer rehabilitation project. Tustin acknowledged that relining with the PVC liner decreased the sewer pipe's diameter by an eighth of an inch to a quarter of an inch but was designed to allow water and material to move faster through the line. On December 23, although the City had relined the main line only a month prior, Tustin testified that the City did not make any adjustments to their routine maintenance and cleaning of the sewer lines and proceeded to complete the regular jetting and cleaning of the sewer lines on that date. Tustin testified that video inspections were completed prior to the relining, following the relining, and the day after the sewer backflow. Tustin acknowledged that the manholes were in a somewhat deteriorated state and that there were some loose and missing bricks in the manholes; that there was a broken section of the sewer line located at the Downstream Manhole; that debris had accumulated in the area of the Downstream Manhole; that there were cracks in the main sewer line between the manholes; that there were cracks and broken clay pipes in the lateral lines; that after the relining, there were missing bricks in the "bench of the manhole"; and that debris was left in the manhole, such as sand and grit, following the November 16 video inspection after the relining had been completed.

As it relates to the blockage, Tustin testified that after being notified of the sewer backflow, he immediately responded to the area and checked the Upstream Manhole, which had water. He then checked the Downstream Manhole and observed that there was no water. As a result, Tustin concluded that the blockage was somewhere between the two manholes and directed the flushing crew to flush the line. While flushing the line with a flushing hose, Tustin indicated they hit an obstruction about 80 feet further up from the Downstream Manhole and that after they cleared the obstruction, water began flowing again. The following day, a follow-up inspection was completed, and the City employees retrieved a brick and a piece of asphalt from the Downstream Manhole, which Tustin testified he had not observed in the manhole the previous day. Tustin testified that the cause of the blockage was never determined, but that it was something lodged in the sewer line 80 feet up from the Downstream Manhole and that the broken clay sewer pipe at the Downstream Manhole had nothing to do with the blockage that caused the backflow.

Tustin testified that the broken clay pipe did not contribute to the sewer backflow because there had been no prior problems in that area, there was no standing water in the Downstream Manhole after Eakes reported the problem, and when the line was dislodged 80 feet from the Downstream Manhole, water began to flow freely again. The City was unable to determine what caused the blockage at the point where the City's crew encountered it.

## 2. Janulewicz' Deposition Testimony

The deposition of Janulewicz, the City's corporate designee, set forth that beginning in 2016, he was the City Attorney, and between 2019 and 2022, he was appointed as the City Administrator. In these capacities, Janulewicz had an indirect supervisory role over the City's sanitary sewer system as he supervised the public works director who, in turn, supervised the sanitary sewer wastewater division. According to Janulewicz, on December 23, 2019, City employees were jetting or cleaning the sewer line between Madison Street and Adams Street as part of routine maintenance. Janulewicz testified that the insurance carrier adjuster investigated

the cause of the backflow but, to his knowledge, no final determination had been made regarding the cause of the backflow. The insurance letter drafted by the City's insurance carrier provided:

On December 23, 2019, our insured's employees with the utilities department were doing a routine maintenance on a line near 18 Madison Street to east of Adams Street which is near the Kermit's Car Wash. This line is jetted twice a year as part of the [C]ity's sewer maintenance program. There were no problems reported with this line. Apparently, there was a brick and a chunk of asphalt that was in the line and the jetting may have caused this to flow down the line and end [up] near the line servicing your business. Some other debris attached to these two objects and this plugged the line resulting in the backup.

This was an unfortunate event which caused extensive damage to your building and equipment. With the information we have obtained to date, we do not feel there was anything the [C]ity could have done to prevent this loss. The [C]ity was not aware of any problems with any of the sewer lines in your area prior to this loss occurring. The [C]ity has a regular and extensive maintenance program. Therefore, we do not feel the [C]ity was negligent in causing your loss and will not be able to accept liability for your damages.

### 3. MILLER'S DEPOSITION TESTIMONY

Miller testified that on December 23, 2019, between 1:30 and 2:30 p.m., he was on a conference call when he noticed an odor in the building and observed numerous people exiting the basement. After stepping out of his office, someone made him aware of a "sewer mishap" downstairs. Miller testified that Paul McKinney called the City while he worked to get people out of the basement. McKinney informed Miller that a City employee stated that the backflow occurred due to the City's cleaning out of the sewer line. Miller testified that a toilet had been actively backing up for approximately 45 minutes at that time, and that he and some other employees attempted to prevent the sewage from traveling any further than it already had. At some point, City representatives arrived on-site, the backflow stopped, and Miller assessed the damage, including taking photographs and videos, and created a plan for the business' different needs. The following day, December 24, Miller spoke to City employees in the alleyway who told him that there was some form of debris or clay that caused a block downstream of the building and that the pressure started working back until it found a release with the toilet inside the building. One of the City employees handed Miller a card regarding sewer backflow information and information about how to file a claim.

### 4. SANDERS' DEPOSITION TESTIMONY

Sanders testified that he was asked to investigate the circumstances of the sewage backflow, and that he was able to determine the cause. He opined that there were

multiple factors that factored into it and caused the incident. But there was a flushing operation upstream, so to speak, at the sewer system that was being performed by the City or their contractors on December 23rd, 2019, that evidence indicates that they had flushed the sewer piping upstream of the Eakes property and flushed debris through the piping which then collected, settled, and impeded flow at the manhole downstream of the Eakes property.

And . . . material, essentially, hung up on some broken piece of piping within the sewer system downstream of the Eakes property and impeded flow and, essentially, backed sewage back up into the Eakes property. There are other factors detailed in the report. That's kind of the short answer, though.

Sanders opined that when the City began the process of relining the pipes in November 2019, the City's video inspections revealed deteriorated and broken pipe "that were having debris hold up on them and caus[ing] obstructions" and that those conditions were not addressed or remediated prior to the incident. He further opined that the City's failure to take into account that the relining caused things to move quicker when they were performing the jetting operation upstream of the Eakes' property was "directly causative to the incident at the Eakes' property." According to Sanders, the video taken the day following the backflow into Eakes' property depicted large pieces of debris consistent with a brick and the rock or piece of asphalt and a broken clay pipe in the Downstream Manhole that was sticking up above the waterline that the objects were collecting on. Sanders testified that "it's that condition that we see was causing the objects to collect and sit there and obstruct flow the month prior, in — November inspection videos as well." Sanders noted that the video depicted deteriorated brick construction in the manholes and missing bricks from the manhole construction before the incident, and then a day after the sewer backflow, there was a brick sitting in the sewer main at the Downstream Manhole obstructing the flow of wastewater. He testified that "the brick likely came from one of the manholes . . . in the sewer system upstream of the Eakes Property." Sanders opined that the broken clay pipe "certainly contributed" to the sewer backflow on December 23, 2019. Regarding whether the City should have had a reason to believe that a backflow would occur, Sander opined that "they were having obstructions occur at this location a month prior to this event. And their contractors were on site and documented that condition, and I would have expected that the City would be aware of that and take that into account and respond to that condition" and that, had the City addressed the condition that was discovered by its contractor in November, "it could have prevented the backup incident that occurred in December."

## 5. DISTRICT COURT'S ORDER

In August 2024, the district court entered an order granting the City's motion for summary judgment. As it related to Eakes' negligence claim, the district court found that "reasonable people could not disagree about the unforeseeability of the injury" due to the undisputed evidence that the City had no prior problems with the subject line, had never had a sewer backflow on that section of the line, and the City performed regular maintenance as required on the line. The district court further found that Eakes' argument that the inspection of the line that occurred approximately 1 month prior to the incident, during which a broken piece of clay pipe was observed by video at the bottom of the Downstream Manhole, was insufficient to establish that the sewer backflow was foreseeable. The court found "[Eakes'] expert witness opines that debris likely became caught on the broken piece of pipe, which contributed to the incident. But this conclusion is speculative and not sufficient to create a genuine issue of material fact. The undisputed facts instead show that the broken clay pipe played no part in the backup." The court concluded that "no genuine issue of

material fact exists and that 'reasonable people could not disagree about the unforeseeability of the injury.'"

In denying Eakes' res ipsa loquitor claim, the district court opined that as to the first element under the doctrine of res ipsa loquitor, "the Nebraska Supreme Court has recognized that '[i]t is obvious that sewers back up for a variety of reasons; some the result of negligence, others not.'" And regarding the second element, "Eakes cannot establish that the instrumentality which produced the occurrence was under the exclusive control of the City." Further, the court held that the "same reasoning applies to third element as the City has provided an explanation for the obstruction."

As it related to Eakes' claim of inverse condemnation, the district court stated:

For many of the same reasons already noted, the Court finds the evidence insufficient to support an inverse condemnation claim. There exists no evidence that the sewer line at issue suffered from recurring, permanent, or chronic backups. To the contrary, the undisputed evidence shows that the City had no prior problems with the subject line, that there had never been a sewer backup on that section of line, and that the City performed regular maintenance as required on the line. Because there had been no recurring sewer backups, nor was it known or foreseeable that any action would take or damage private property, the Court finds summary judgment on this claim also appropriate.

## III. ASSIGNMENTS OF ERROR

Eakes assigns, renumbered and restated, that the district court (1) made improper factual findings in granting summary judgment in favor of the City and (2) erred in dismissing its complaint alleging causes of action for (a) negligence, (b) inverse condemnation, and (c) res ipsa loquitor.

## IV. STANDARD OF REVIEW

An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id*.

## V. ANALYSIS

Before considering Eakes' specific assigned errors, we briefly summarize the standard for reviewing motions for summary judgment.

As the Nebraska Supreme Court stated in *Clark v. Scheels All Sports*, 314 Neb. at 58-60, 989 N.W.2d at 47-48:

Summary judgment has been statutorily authorized in civil actions in Nebraska since 1951. Summary judgment motions may be filed by parties who are asserting, and by parties who are defending against, a claim, counterclaim, cross-claim, or request for declaratory

- 6 -

judgment. A party may seek summary judgment as to "all or any part" of such claims. We have long observed that one of the primary purposes of summary judgment is to pierce the allegations in the pleadings and show conclusively that the controlling facts are other than as pled.

The statutory procedure governing summary judgment motions is set out in § 25-1332. Section 25-1332 identifies the type of evidence that may be received on a motion for summary judgment and the legal standard to be applied when deciding such motions. Regarding the former, the statute provides, "The evidence that may be received on a motion for summary judgment includes depositions, answers to interrogatories, admissions, stipulations, and affidavits." Regarding the latter, the statute provides that summary judgment "shall be rendered forthwith if the pleadings and the evidence admitted at the hearing show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Consistent with these statutory provisions, our cases have long held that summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. Likewise, our cases have long held that the party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. But in the absence of a prima facie showing by the movant that he or she is entitled to summary judgment, the opposing party is not required to reveal evidence which he or she expects to produce at trial.

### 1. Improper Factual Findings Regarding Cause of Blockage

Eakes generally argues that the district court erred in granting summary judgment in favor of the City and in dismissing its claims of negligence, res ipsa loquitor, and inverse condemnation. Eakes argues that the district court made improper factual findings in dismissing each of its claims and that material facts were in dispute which prevented the court from granting the City's motion, including whether the broken clay sewer pipe caused the backflow, whether the City's actions contributed to the backflow, and where the backflow occurred in the subject line.

More specifically, Eakes contends that the testimony of Sanders and Tustin created a factual dispute. As Eakes argues in its brief, Sanders opined that the blockage must have occurred at the Downstream Manhole where the clay sewer line was broken and debris was caught up and impeding the flow of water; that the City had knowledge that the pipe was broken and impeding the flow of water in that location a month before the backflow from video that the City's contractor obtained before installing the liner in the sewer line; that the City should have repaired the broken pipe and removed the debris which eventually caught on the pipe prior to the blockage; and that the failure to address the conditions observed during the video inspection rendered the blockage a foreseeable consequence. Although Eakes recognizes that Tustin presented a different opinion

about the cause and site of the blockage, Eakes argues that this creates a question of fact for the fact finder which should have precluded summary judgment being entered in the City's favor.

Although we agree that summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts, we disagree that Sanders' testimony was sufficient to create a question of fact in relation to Tustin's testimony on the cause of the blockage.

The critical issue presented is the cause of the sewer blockage and resulting backflow. Tustin testified that he personally responded to the site after receiving notice of Eakes' sewer backflow and that he observed water in the Upstream Manhole but not the Downstream Manhole. Based upon those facts, he concluded that the blockage was present somewhere along the main sewer line between the two manholes. There is no testimony in the record that contradicts that finding. As a result, Tustin testified that he had his crew flush the line between the manholes using a flushing hose and found a blockage approximately 80 feet up from the Downstream Manhole. By clearing the blockage at that location, water began flowing and the blockage was cured. Because Tustin and his crew were unable to see what they encountered in the sewer line 80 feet up from the Downstream Manhole, he was unable to state what caused the blockage at that spot, but he unequivocally stated that is where the blockage occurred.

In contrast, Sanders testified that following the blockage, debris consistent with a brick and rock or piece of asphalt was discovered at the Downstream Manhole. He surmised that this debris was held up or stuck on the broken pipe which caused the blockage once the City forced water down the pipe during its regular maintenance operation. In his testimony, Sanders attempted to attribute the blockage to debris being caught up on the broken sewer line located in the area of the Downstream Manhole as observed by the City's contractor before completing the relining of the sewer line. But Sanders' testimony is inconsistent with the uncontradicted facts provided by Tustin. Although Tustin acknowledged that video taken prior to relining the sewer line indicated that there was an area of the sewer line which was broken, that area was located at the juncture of the Downstream Manhole. Notably, the area where the blockage occurred was 80 feet upstream from the area of the broken clay line. There is no evidence in the record from videos taken prior to the relining of the sewer line of a broken clay line or debris in the area where the blockage occurred. And, as we explain more fully in our analysis of the three causes of action brought by Eakes, that is significant to our resolution of the claim.

As it relates to the critical issue of causation, the City, through Tustin's testimony, made a prima facie case that the cause of the blockage occurred 80 feet upstream from the Downstream Manhole and there was no evidence to indicate, prior to the blockage, of why a blockage eventually occurred there. That shifted the burden to Eakes to show the existence of a material issue of fact on that issue. On this record, reasonable minds cannot differ on the origin of that blockage. Similar to the district court, we find Sanders' statement that the cause of the blockage was debris that eventually caught on the broken pipe near the Downstream Manhole was based upon pure speculation and his testimony was not sufficient to overcome Eakes' burden to produce evidence showing the existence of a material issue of fact on the cause and origin of the blockage. On this limited issue, we find that the court did not err in finding that there was no material issue of fact as to the location of the blockage.

## 2. DISMISSAL OF EAKES' CLAIMS

Having determined there was no dispute of fact governing the location of the blockage, we now turn to the causes of action brought by Eakes in order to determine whether the court erred in granting summary judgment as to each such claim.

### (a) Negligence

Eakes first claim sounds in ordinary negligence. Ordinary negligence is defined as the doing of something that a reasonably careful person would not do under similar circumstances, or the failing to do something that a reasonably careful person would do under similar circumstances. *Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000). A negligence action brought under the PSTCA has the same elements as a negligence action against an individual. *Id.* In order to prevail in a negligence action, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately caused by the failure to discharge that duty. *Id.*

In a negligence case, a defendant's conduct should be examined not in terms of whether there is a duty to perform a specific act, but, rather, whether the conduct satisfied the duty placed upon individuals to exercise such degree of care as would be exercised by a reasonable person under the circumstances. See *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010). Foreseeable risk is an element in the determination of negligence, not legal duty. *Id.* In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence. *Id.* Courts should leave determinations of the extent of foreseeable risk to the trier of fact unless no reasonable person could differ on the matter. *Id.*

Applying that standard here, the district court determined that reasonable minds could not differ about the lack of foreseeability of the backup, and therefore the City did not breach its duty of reasonable care. In support of that conclusion, the court found that the record provided undisputed evidence that the City had no prior problems with the line located near Eakes' property; that there had never been a sewer backflow in that area; that the City performed routine maintenance on the sewer line as required; and that there was no evidence to suggest the blockage would occur when and where it did. We agree. Although we recognize these matters are typically left to the trier of fact, we agree that reasonable minds cannot differ on this record. As we noted before, the entirety of Eakes' claim was grounded in Sanders' theory that the blockage occurred at the Downstream Manhole in the area where the City's contractor previously observed damage to the sewer line before relining it. Based upon that theory, Eakes argued that the City was on notice of the damaged line prior to the blockage, was aware that damage to the line could result in a blockage, and that the subsequent blockage was a foreseeable consequence of the City's failure to repair the damaged line.

But contrary to Sanders' speculative assessment, the blockage occurred nearly 80 feet upstream of the Downstream Manhole. This is consistent with Tustin's direct observation of the Downstream Manhole and the crew's discovery when they used a flushing hose to flush out the blockage. Because we found that reasonable minds could not differ on this record governing the location of the blockage, we likewise agree with the district court that there was no evidence in this record demonstrating that the blockage at this location and the associated backflow of sewage

was a foreseeable risk. Accordingly, the district court did not err in granting summary judgment on Eakes' negligence claim.

## (b) Inverse Condemnation

Next, Eakes argues that the district court erred in granting summary judgment and dismissing its claim of inverse condemnation.

Inverse condemnation is a shorthand description for a landowner suit to recover just compensation for a governmental taking of the landowner's property without the benefit of condemnation proceedings. *Essink v. City of Gretna*, 25 Neb. App. 53, 901 N.W.2d 466 (2017). In order to meet the initial threshold in an inverse condemnation case that the property has been taken or damaged "for public use," it must be shown that there was an invasion of property rights that was intended or was the foreseeable result of authorized governmental action. *Henderson v. City of Columbus*, 285 Neb. 482, 493, 827 N.W.2d 486, 495 (2013).

Here, in granting summary judgment in favor of the City, the district court once again focused on the element of foreseeability and determined that reasonable minds could not disagree about the unforeseeability of the backflow and resulting damage on this record. In support of that finding, the court found that the only credible evidence provided that the backflow took place some 80 feet upstream of the Downstream Manhole; that the City had no prior reported problems with the sewer line at that location; that there had never been a sewer backflow in this area; and that the City was simply providing routine maintenance as required at the time the blockage occurred with no foreseeable reason to believe that the maintenance would result in a blockage of the sewer line at this location. Again, because Eakes' theory governing foreseeability was linked to a blockage occurring where the sewer line was damaged near the Downstream Manhole, which was rejected by the district court and this court, we find that reasonable minds cannot differ on the element of foreseeability and affirm the district court's grant of summary judgment as to Eakes' claim of inverse condemnation. See *Essink v. City of Gretna*, 25 Neb. App. at 62, 901 N.W.2d at 473-74 (holding that "absent evidence of frequent or recurring sewer backups in the past, [Appellees] failed to prove the threshold issue of whether the backups were intended or were the foreseeable result of authorized government action").

## (c) Res Ipsa Loquitor

Lastly, Eakes assigns that the district court erred in granting summary judgment and dismissing its claim of res ipsa loquitor.

The doctrine of res ipsa loquitur is that where the instrumentality causing the injury is shown to be under the defendant's exclusive control and management and the accident is one that in the ordinary course of things does not occur if those who have its management or control use proper care, reasonable evidence is afforded, in the absence of an explanation by the defendant, that the accident arose from want of proper care. *Maly v. Arbor Manor, Inc.*, 225 Neb. 276, 404 N.W.2d 419 (1987).

In *Evans v. Freedom Healthcare*, 311 Neb. 336, 347-48, 972 N.W.2d 75, 84 (2022), the Nebraska Supreme Court stated:

> There are three elements that must be met for res ipsa loquitur to apply: (1) The occurrence must be one which would not, in the ordinary course of things, happen in the

absence of negligence; (2) the instrumentality which produces the occurrence must be under the exclusive control and management of the alleged wrongdoer; and (3) there must be an absence of explanation by the alleged wrongdoer. See *Roberts v. Weber & Sons, Co.,* 248 Neb. 243, 533 N.W.2d 664 (1995). See, also*, Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). When applicable, the essence of the doctrine is that an inference of negligence arises without further proof and that the facts speak for themselves. *Long v. Hacker, supra.* Res ipsa loquitur is a procedural tool that, if applicable, allows an inference of a defendant's negligence to be submitted to the fact finder, where it may be accepted or rejected. *Anderson v. Union Pacific RR. Co.*, 295 Neb. 785, 890 N.W.2d 791 (2017).

At the summary judgment stage of litigation, when deciding whether res ipsa loquitur applies, a court must determine whether evidence exists from which reasonable persons can say that it is more likely than not that the three elements of res ipsa loquitur have been met. See *McLaughlin Freight Lines v. Gentrup*, 281 Neb. 725, 798 N.W.2d 386 (2011). If such evidence is presented, then there exists an inference of negligence which presents a question of material fact, and summary judgment is improper. *Id.* The court should not weigh the evidence to determine whether res ipsa loquitur applies. *Id*. Instead, the court must determine whether there is sufficient evidence from which reasonable persons could find that it is more likely than not that the three elements of res ipsa loquitur have been proved and that it is therefore more likely than not that there was negligence associated with the event. *Id*.

Here, the district court found that a sewer backup is not a matter that would not happen in the ordinary course of things in the absence of negligence. We agree. See, *Yost v. Village of North Loup,* No. A-15-861, 2016 WL 6956772 (Neb. App. Nov. 29, 2016) (selected for posting to court website) (finding evidence showed sewer backups can occur for variety of reasons apart from negligence of city); *Maly v. Arbor Manor, Inc.*, 225 Neb. 276, 280, 404 N.W.2d 419, 423 (1987) (stating "It is obvious that sewers back up for a variety of reasons; some the result of negligence, others not."). Because we reject Eakes' contention on this record that sewer backflow of this nature would not occur in the absence of negligence, we find that the district court did not err in granting summary judgment on Eakes' res ipsa loquitor cause of action.

## VI. CONCLUSION

Having found that no genuine issues of material fact exist, we affirm the district court grant of summary judgment in favor of the City.

AFFIRMED.